UN ITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JERRY J. DUWENHOEGGER, SR.,                CIVIL NO. 10-3965 (PJS/JSM)

      Plaintiff,

v.                                          REPORT AND RECOMMENDATION

JOHN KING, et al.,

      Defendants.

JANIE S. MAYERON, United States Magistrate Judge

     The above matter came on before the undersigned upon plaintiff's Motion for a Restraining Order [Docket No. 50], plaintiff's Motion for a Protective Order [Docket No. 51], plaintiff's Motion for Declaratory Judgment [Docket No. 78] and plaintiff's Motion for Protective Order [Docket No. 88].

     This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).

## I.    PLAINTIFF'S MOTION FOR A RESTRAINING ORDER [DOCKET NO. 50] AND MOTION FOR A PROTECTIVE ORDER [DOCKET NO. 51][1]

### A.    Background

     This case arises out of plaintiff's complaint for violation of civil rights under 42 U.S.C. § 1983, including among other claims, denial of access to the courts.  See Second Amended Complaint [Docket No. 45].   In the matter presently before the Court, plaintiff seeks a restraining order pursuant to Rule 65 of the Federal Rules of Civil

---

[1]    Because these two motions seek similar relief, the Court addresses them together.

Procedure on the basis that since 2009, defendants have seized, destroyed and disposed of his legal materials in order to deny him access to the courts. <u>See</u> Motion for Restraining Order [Docket No. 50], p. 1. In addition, plaintiff asserted that defendants transferred him from Minnesota Correctional Facility in Stillwater ("MFC-STW") to the Minnesota Correctional Facility in Oak Park Heights ("MFC-OPH") in order to deny him due process, access to the courts and his right to redress of grievances. <u>Id.</u>

Plaintiff alleges the following facts in support of his underlying his motions: On November 4, 2010, plaintiff was transferred from MFC-STW to MFC-OPH and placed in punitive segregation without any of his personal or legal property. <u>Id.</u> On December 6, 2010, plaintiff only received one 12" x 12" box of his private legal property out of the seven square feet of legal property he owned. <u>Id.</u> Defendants did not follow Minnesota Department of Corrections ("MDOC") policy when they failed to keep a complete inventory on the chain of custody and disposal of his legal property. <u>Id.</u> Despite their conduct, plaintiff was able to acquire a copy of his original Complaint with attachments. <u>Id.</u> In addition, plaintiff has received the Federal Rules of Civil Procedure, the Federal Rules of General Practice, the Local Rules of the District of Minnesota, as well as the Minnesota Rules of Civil Procedure, the Minnesota General Rules of Practice, "the rules of court" and the United States Code. <u>Id.</u> Plaintiff has prepared and filed legal materials and evidence in his possession since December 2010. <u>Id.</u>, p. 2. Since December 2010, plaintiff has had the same legal materials in his possession, the materials have been searched, no contraband has been found, and staff at MFC-OPH have had no problem with the quantity of his legal materials. <u>Id.</u> Plaintiff only possessed the legal materials he needed for his present cases and maintained his materials in an orderly fashion so as to not block any windows or the view into his room. <u>Id.</u>

On May 6, 2011, staff at MFC-OPH threatened to seize and destroy all legal materials over five pounds.  Id.  Plaintiff asserts he cannot dispose of any of his legal materials without suffering irreparable and permanent harm.  Id.  For over 11 years he has been allowed to have more than five pounds of legal materials in punitive segregation, and staff routinely waived the policy because it violates the law that allows offenders to have access to the courts.  Id.  Defendants are threatening plaintiff with further punishment, seizure, damage, injury and loss of his legal materials to deny him due process, access to the courts and other rights.  Id.

The relief sought by plaintiff is an order from the Court restraining defendants from seizing any or all of his legal materials for the duration of the present action.  Id., p. 4.

Plaintiff also filed a Motion for a Protective Order.   [Docket No. 51].   This pleading alleges that on May 21, 2011, Associate Warden of Administration, Mary McComb, ("McComb") sent four correctional officers to his room and seized all his legal materials, save for a couple filings in a Washington County District Court matter.  Id., p. 1. According to plaintiff, some of the materials taken included his filings, attachments and orders from the present case, and his copy of the Federal Rules of Civil Procedure, the Local Rules for this District, the U.S. Code, the Minnesota Rules of Civil Procedure, court forms and evidence.  Id., p. 1.  Plaintiff claims that he has no access to the court and seeks the immediate return of all of his legal materials and that defendants be precluded from taking legal materials from his room.  Id., pp. 1-2.  Plaintiff also seeks an order requiring his removal from punitive segregation and placement in the general population pending the adjudication of this case.  Id., p. 2.

In response to plaintiff's motions, defendants provided the Court with the following information: Plaintiff was admitted to the custody of the Minnesota Commissioner of

Corrections on April 27, 1999, following his conviction for conspiracy to commit murder and sentencing to 180 months in prison. See Affidavit of Mary McComb [Docket No. 64] ("McComb Aff."), ¶¶ 7, 8.[2]  Plaintiff was initially incarcerated in Minnesota Correctional Facility-St. Cloud. Id., Ex. B, p. 3.  Plaintiff was incarcerated at MCF-STW from December 15, 2004 until November 4, 2010, at which time he was transferred to MFC-OPH. Id., pp. 2-3. Because of his criminal history and history of disciplinary violations, plaintiff is classified as a level 5 offender, the maximum security level for an offender, indicating that he presents a very high security risk.  Id., ¶ 8 Ex. B, p. 1.

While at MCF-STW, plaintiff was found guilty in at least 18 instances of disciplinary violations that resulted in segregation.  Id., Ex. C (Discipline History Report).  Because of the amount of segregation time plaintiff has received and because many of his disciplinary rule violations stem from his possession of contraband, MDOC decided to transfer plaintiff from segregation in MCF-STW to segregation in MCF-OPH.  Id., ¶ 11. According to McComb, MCF-OPH's segregation units present a more secure environment and MCF-OPH is the only facility that is designated to house inmates who are classified as level 5.  Id., ¶¶ 6, 11.

Plaintiff was sent to MCF-OPH on disciplinary segregation status, was initially placed in Complex 5, and then on November 10, 2011 was placed in the administrative control unit ("ACU").  Id., ¶ 12.  Both Complex 5 and the ACU are segregation units at MCF-OPH for offenders with significant discipline and behavior problems.  Id.  The ACU is a closed unit that is maintained primarily for the purpose of separating inmates convicted in a disciplinary hearing from other inmates as a punishment for violating rules

---

[2]   At the time McComb submitted her Affidavit, she was the Associate Warden of Administration at MCF-STW.  See McComb Aff., ¶ 2.  She was Associate Warden of Administration at MCF-OPH from May 2008 to June 7, 2011.  Id.

and regulations of the institution.   Id., ¶ 13.   According to McComb, plaintiff has been appropriately placed in segregation as a result of his disciplinary violations, and it would be inappropriate to release him to the general population because it would negate the punishment he received for violating offender disciplinary rules and give him an unfettered ability to continue to violate offender disciplinary rules in the future.   Id.

Pursuant to MDOC's Division Directive 301.010, prison staff may search an offender's living area at any time without cause in order to search for contraband.   Id., Ex. D.   MDOC's Division Directive 301.030 prohibits inmates from possessing contraband including:

> Documents containing information detailing the circumstances of another offender's crime (e.g., offender face sheets, legal documents, police reports, internet material, newspaper clippings, etc.).   An offender is allowed to possess such material about him/herself only.   Such documents concerning another offender are only allowed if the possessing offender demonstrates to the discipline supervisor or correspondence review authority that the documents are needed to pursue his/her own criminal appeal. These documents are not permitted for the purpose of an offender performing legal work or providing legal advice to another;
>
> Any information related to filing false or fraudulent Uniform Commercial Code (UCC) liens, including bank or completed UCC forms, materials related to copyrighting one's own name, materials describing or advocating filing UCC liens against government employees (see also Division Directive 302.020 "Mail"). . . .

Id., Ex. E, p. 2.

According to McComb, some offenders attempt to hide prohibited non-legal contraband in legal materials. Id., ¶ 15.   For all of these reasons, legal materials are not exempt when correctional officers search offenders' cells.   Id.

Under MDOC's Division Directive 301.083 - Segregation Unit Management, which is applicable to both to Complex 5 and the ACU, an inmate on disciplinary segregation

status is limited to five pounds of legal materials in his cell at a time.   Pursuant to MDOC's Division Directive 302.250 - Offender Property, all other legal materials owned by an inmate must be stored in a legal bin for the inmate, which must fit into the two footlockers assigned to the inmate, along with other allowable property an inmate may store in the footlockers.   Id., ¶ 17, Exs. F, p. 5; G, p. 2.   The amount of property offenders in segregation are allowed to keep in their cells is minimized because they are high security risk inmates who have violated facility rules and engaged in behavior that is disruptive, threatening and often violent.   Id., ¶ 18.   The five-pound limit is designed to prevent the hiding of contraband, to limit their access to combustible materials, and to limit the items they can convert into weapons.   Id.

The ACU Handbook provides that an inmate on disciplinary segregation status in the ACU is allowed to access five pounds of materials from his legal bin on the first Thursday of each month.   Id., ¶ 23. Ex. H, p. 9.   This policy allows an inmate to rotate the five pounds of legal materials he may possess in his cell each month.   Id., ¶ 23.   If an inmate is involved in active litigation, he may request in writing that an exception be made to the policy so that he can rotate his legal materials into his cell more frequently.   Id.

When plaintiff was transferred from MCF-STW to MCF-OPH in November 2010, there was a delay in the transfer of his property.   Id., ¶ 19.   On November 16, 2010, McComb received a kite (an informal written communication) from plaintiff inquiring about the status of his property.   Id.   A property sergeant at MCF-OPH notified McComb that plaintiff's property was expected on November 16, 2010.   Id.   On November 17, 2010, staff at MCF-STW inventoried five footlockers of plaintiff's property.   Id.   Plaintiff was sent a notice that the property exceeded the two footlockers limitation and requested

instructions from him as to what he wanted to do with the property.   Id.   Plaintiff returned the notice and authorized sending 25.7 pounds of excess property to his daughter.   Id.

Two footlockers containing plaintiff's property arrived at MCF-OPH on or about November 19, 2010.   Id.   McComb was uncertain as to the cause of the delay.   Id. McComb had also received two boxes of documents from MCF-STW property staff that were possibly contraband.   Id., ¶ 20.   After reviewing these materials, McComb on November 29, 2010, gave plaintiff a box of documents that she believed plaintiff might consider legal materials, and confiscated other papers that she determined to be contraband under MDOC policy.   Id.

On December 10, 2010, plaintiff wrote to McComb and notified her that on November 29, 2010, he was given the opportunity to go through his personal property and legal materials to choose what to keep in his cell, what to retain in his legal bin and two storage footlockers, and what to send out of the facility.   Id., ¶ 21.   Plaintiff told McComb that he believed he was missing some his legal materials.   Id.   On January 7, 2011, plaintiff was given another opportunity to sort through his personal property and legal materials and decide what to keep in his cell, what to retain in his bin, and what to send out of MCF-OPH.   Id.

Due to the five-pound limitation on legal materials he could possess in his cell while in segregation, MDOC staff repeatedly directed plaintiff to select the legal materials he wanted, in order to get the total below the five-pound limit.   Id., ¶ 22.   Since January 2011, plaintiff's cell has been inspected more than five times where MDOC staff found that he possessed more than five pounds of material.   Id., ¶ 25.   Each time he was told to select five pounds of material to keep and was told that the excess would be disposed

in accordance with his direction.   Id.   Each time, plaintiff selected the papers to be destroyed and MDOC staff did not.   Id.

McComb disputes plaintiff's claim that on May 9, 2011, she sent correctional officers into his cell to seize all of his legal materials, and denied any assertion that MDOC has taken away all of his legal materials or that defendants are threatening him with denial of access to the courts and other harm.   Id., ¶¶ 24-26.   According to McComb, plaintiff has always had access to five pounds of legal materials in his segregation cell at MCF-OPH.   Id., ¶ 25.

Since May 9, 2011, plaintiff has been able to file numerous pleadings in the present case, many of which include him citing to applicable law or responding to pleadings submitted by defendants.   See Docket Nos. 66, 67, 68-70, 77, 78-82, 87, 88-93, 95-96, 101-103, 108, 113-115.   In addition, on June 21, 2011, plaintiff filed four separate conciliation actions in Washington County District Court.   See McComb Aff., Ex. K.

In their opposition to plaintiff's motions for a temporary restraining order and a protective order, defendants argued that plaintiff failed to meet the standards for a preliminary injunction.   See Memorandum of Law in Opposition to Plaintiff's Motions for a Restraining Order and an Order for Protection [Docket No. 63], p. 7.   In particular, plaintiff failed to demonstrate that he will be irreparably harmed since he has been able to keep legal papers in his cell pursuant to policy, to decide which papers he wanted to retain in his cell, and to commence this case and several state cases despite his claims that he has not had access to his legal materials.   Id., pp. 6-8.   Defendants also asserted that he is unlikely to prevail on the merits because he has not shown that he has been precluded from enforcing a legal right and because the regulations limiting his

access to five pounds of legal materials are reasonably related to legitimate penological interests.  Id., pp. 9-12.   Further, if staff is not allowed to control the amount and type of papers in a cell, the harm to MDOC outweighs any theoretical harm to plaintiff, and the public interest favors policies ensuring security, safety and efficient use of prison resources.  Id., p. 12.

In his reply, plaintiff argued that this Court's Local Rules and the Federal Rules of Civil Procedure weigh five pounds alone, just as his filings and transcripts weigh more than five pounds, and that the five-pound rule makes it impossible for him to retain copies of evidence.  See Answer to Defendant's Memorandum in Opposition to Plaintiff's Motion for a Restraining Order and Order for Protection [Docket No. 66], pp. 1-2.[3] Plaintiff also claimed that he does not have access to his footlockers, and that while he had five footlockers and five paper bags of documents at MCF-STW, the two boxes sent to McComb amounted to less than one footlocker.  Id.   Plaintiff represented that he had over 32 pounds of legal materials in his room from November 2010 through March 2011, with no contraband found, and no assertion by defendants that the amount was excessive.[4]  Id.   Plaintiff also claimed that he has received two dismissals in state

---

[3]     Plaintiff also maintained that he has not been found guilty of filing false or fraudulent UCC liens and claimed that defendants have exaggerated his disciplinary history.  Id., p. 2.

[4]     Plaintiff raised this assertion for the first time reply, thus preventing defendants from having a proper opportunity to respond to it.   See Nielsen v. U.S. Bureau of Land Management, 252 F.R.D. 499, 528 n. 15 (D. Minn. 2008) (citing Simon v. Yecke, No. Civ. 03-6500 JNE/JGL, 2004 WL 3739590 at *4 n. 4 (D. Minn. June 1, 2004) (noting that "it is improper to bring wholly new arguments in a Memorandum in Reply")).   In any event, McComb disputed this assertion to some extent.   McComb stated that in December 2010 and January 2011, plaintiff had the opportunity to choose what to keep in his cell, what to place in his legal bin and what to send out of the institution.  See McComb Aff., ¶ 21. Further, McComb indicated that since January 2011, plaintiff's cell was inspected on more than five occasions when MDOC staff found that he had more than five pounds of legal materials.  Id., ¶ 25.   On each occasion, he was instructed to select five pounds of

district court in July 2011 due to the fact that he did not have access to the state rules and had no information on what was needed for filing. Id., p. 3. Plaintiff disputed the fire hazard posed by his papers given the lack of electrical appliances in his cell and maintained he had stacked the materials under his cement bunk bed without a problem. Id. In his response to the McComb Affidavit, plaintiff argued that McComb lied about not taking papers that are not contraband or threatening to restrict his access to the courts, he has no place to keep responsive papers that defendants are filing, and his segregation is illegal. See Docket No. 77.

   **B.    Analysis**

   "When evaluating whether to issue a preliminary injunction,[5] a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest." Roudachevski v. All-American Care Centers, Inc., 648 F.3d 701, 705 (8th Cir. 2011) (citing Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "None of these factors by itself is determinative; rather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222

---

material that he wished to keep and was told that the excess would be disposed in accordance with his direction. Id. Plaintiff selected which material to keep in his cell. Id. What is not clear from McComb's affidavit, is whether the amount of legal materials in plaintiff's cell ever met the five-pound limit.

[5]    Courts in the Eighth Circuit apply the same standards to a request for a preliminary injunction and temporary restraining order. See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project, 877 F.2d 707, 708 (8th Cir.1989) (affirming the district court's application of the Dataphase factors to a motion for a temporary restraining order); Jackson v. Nat'l Football League, 802 F. Supp. 226, 229 (D. Minn. 1992) (concluding that the Dataphase factors apply to requests for temporary restraining orders and preliminary injunctions) (citations omitted).

(8th Cir. 1986), <u>cert</u>. <u>denied</u>, 479 U.S. 1070 (1987) (citation omitted).   Such injunctive relief is an extraordinary remedy and the movant has the burden of establishing the propriety of an injunction.   <u>See</u> <u>Roudachevski</u>, 648 F.3d at 705 (citing <u>Watkins, Inc. v. Lewis</u>, 346 F.3d 841, 844 (8th Cir. 2003)).   The burden is especially heavy where, as in this case, the moving party seeks not to maintain the status quo, but to obtain relief similar to that which it could obtain after a trial on the merits.[6]   <u>See</u> <u>Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.</u>, 997 F.2d 484, 486 (8th Cir. 1993) (citation omitted).

### 1.    Threat of Irreparable Harm

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts," and the access must be "adequate, effective, and meaningful." <u>Bounds v. Smith</u>, 430 U.S. 817, 821-22 (1977); <u>see</u> <u>also</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996) ("Insofar as the right vindicated by <u>Bounds</u> is concerned, "meaningful access to the courts is the touchstone,") (citation omitted).   Further, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."   <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976).   At the same time, "the failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction."   <u>Adam-Mellang v. Apartment Search, Inc.</u>, 96 F.3d 297, 299 (8th Cir. 1996).

In the context of a claim by a prisoner that he has been denied the right to meaningful access to the courts, the "prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.'"   <u>Hartsfield v. Nichols</u>,

---

[6]    The Court notes that plaintiff seeks the return of all his legal materials as part of his Second Amended Complaint.

511 F.3d 826, 832 (8th Cir. 2008) (quoting White v. Kautzky, 494 F.3d 677, 680 (8th Cir. 2007) (citations omitted)); see also Williams v. Hobbs, 658 F.3d 842, 851-52 (8th Cir. 2011) (citations and marks omitted) ("Those in prison have a constitutional right of access to the courts.   We have held that to state this claim, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim."); Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996) ("Alleging theoretical inadequacies is insufficient.   Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.") (citation omitted); Beck v. Pawlenty, Civil File No. 04-686 (MJD/JJG), 2006 WL 2506993 at *5 (D. Minn. Aug. 29, 2006) ("For a violation of due process based on denial of access to the courts, a prisoner must show an actual injury. To do so, the prisoner is required to demonstrate that, as a result of the conduct of prison staff, the prisoner was denied the opportunity to prosecute a claim. It is insufficient to show that this conduct made litigation inconvenient. Instead the prisoner must show that this conduct actually prevented the prisoner from litigating the claim.") (citing Cody v. Weber, 256 F.3d 764, 767-68 (8th Cir. 2001 provided); Myers, 101 F.3d at 544)).

Thus, access to courts suits are confined to claims by prisoners challenging their sentences or their conditions of confinement, in which the inmate has

established that the denial of access by the prison resulted in actual injury.   <u>Lewis</u>, 518 U.S. at 356.[7]

In this case, plaintiff has provided no evidence to this Court of actual injury—that is that he has been deprived of access to this Court based on the limitations on the amounts of legal documents he can possess in his cell or in his footlockers.   For example, since the inception of this case, plaintiff served and filed correspondence and numerous and lengthy pleadings—indeed, the docket in the instant case is replete with multiple motions for relief, with supporting materials and legal memoranda citing to statutory and case law in support of the motions.   Further, no action has been taken by the Court (for example, refusal to accept a pleading because it was not timely filed) which has deprived him of his opportunity to pursue his suit.

As for plaintiff's claim that two matters in state court were dismissed in July 2011 due to his lack of access to the state rules and information on the requirements for a filing, plaintiff provided this Court with no evidence of the dismissals by the state courts or the basis for such dismissals.   But more critically, the Court presumes that whatever the suits were about, they did not challenge his sentence or conditions of confinement.   In other words, lacking any evidence about the substance of the suits, much less whether they were actually dismissed or for what reason, plaintiff has not shown the requisite actual and irreparable injury to support a motion for injunctive relief.

Of additional significance to this Court's irreparable harm determination is that the evidence indicates that plaintiff can switch out his legal papers from his footlocker to the

---

[7]   The Court notes that some courts examine whether there has been an actual injury under the next prong, likelihood of success on the merits, whereas others, analyze it under the threat of irreparable harm prong.   This Court has chosen to address the presence (or lack of presence) of an actual injury under the threat of irreparable harm prong.

extent necessary.   An inmate in active litigation may rotate legal materials from his legal bin to his cell more frequently than once a month, upon written request of the inmate. Even if plaintiff is required to send out, or have destroyed, legal documents because his legal bins or footlockers are full, does not lead to the conclusion that he has been without documents necessary to ensure his meaningful access to the court.   Moreover, plaintiff's speculation that in the future he will not be able to have meaningful access to this Court without unlimited access to all of his legal papers in his cell is insufficient to establish the threat of imminent harm.   See Graham Webb Int'l v. Helene Curtis, Inc., 17 F. Supp.2d 919, 924 (D. Minn. 1998) ("Possible or speculative harm is not enough."); see also de la Garza v. Fabian, Civ. No. 06-208 (RHK/JJG), 2007 WL 628424 at *4 (D. Minn. Feb. 27, 2007) ("While it is true that under the policies and regulations of the prison and administration of the ACU, Plaintiff might have to make repeated requests for legal materials in order to change out materials he has in his cell with new ones he finds he needs to comply with the five pound prison policy while in the ACU, such procedures rise only to the level of inconvenience. Plaintiff has offered no reason for needing all of his legal materials in his cell at the same time, and his complaints amounting to inconvenience are insufficient to demonstrate that he has suffered actual injury.").

Finally, regarding his transfer from MFC-STW to MFC-OPH, as this Court finds that plaintiff has not come forth with evidence to establish that his ability to petition the courts has been compromised to the point of causing actual injury, the Court finds there is no threat of future irreparable harm resulting from his transfer.

Based on plaintiff's failure to show irreparable harm, his motion for injunctive relief should be denied.

## 2.      Likelihood of Success on the Merits

Plaintiff has asserted that the restriction of his access to the courts violates the First Amendment and his right due process rights under the Constitution.   "Access to the courts is a constitutional right whose basis is unsettled."   Earl v. Fabian, 556 F.3d 717, 726 (8th Cir. 2009) (citing Scheeler v. City of St. Cloud, Minn., 402 F.3d 826, 830 (8th Cir. 2005) (citing Christopher v. Harbury, 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).   The right of access to the courts may be derived from the First Amendment; it may also be grounded in the Fourteenth Amendment Equal Protection and Due Process clauses.   See Scheeler, 402 F.3d at 830-31; Schrier v. Halford, 60 F.3d 1309, 1311 n.3 (8th Cir. 1995) ("Although "[t]he Court's opinion in Bounds is silent as to the source of [the right of access to the courts], ... on other occasions the Supreme Court has said variously that it is founded in the Due Process Clause of the Fourteenth Amendment, ... or the Equal Protection Clause, ... or the First Amendment right to petition for a redress of grievances.") (citation omitted).   "[T]he right of meaningful access to the courts ensures that prison officials may not erect unreasonable barriers to prevent prisoners from pursuing or defending all types of legal matters."   Id., at 1313.

> In Scheeler we concluded that a right to access the courts can be derived from the First Amendment. To prevail under the First Amendment a claimant typically bears the burden of proving that the defendants intentionally restricted his access to the courts. *** On the other hand, "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Earl, 556 F.3d at 726-27.

Regardless of the source of an access-to-courts claim, this Court finds that plaintiff is unlikely to succeed on the merits of this claim.

First, for the reasons stated above regarding the threat of irreparable harm, plaintiff has not presented this Court with evidence of an actual injury – that he has been or will be denied the meaningful ability to prosecute nonfrivolous and arguably meritorious legal claims based on the actions of defendants or prison regulations.   The fact that the limitation of five pounds of legal materials in a cell at any one time may amount to an inconvenience to plaintiff is an insufficient basis to establish an unconstitutional restriction to his access to the courts.

Second, under Turner v. Safley, 482 U.S. 78 (1987), prison rules which restrict a prisoner's constitutional rights are permitted if they are "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such objectives. 482 U.S. at 87.

> Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254.   Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have "a significant 'ripple effect' " on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

Murphy v. Missouri Dep't of Corr., 372 F.3d 979, 982-983 (8th Cir. 2004), cert. denied, 125 S.Ct. 501 (2004) (quoting Turner, 482 U.S. at 89); see also Bonner v. Outlaw, 552 F.3d 673, 678 (8th Cir. 2009) (citing Turner factors).

In reconciling the competing interests of an inmate's constitutional interests and a prison's regulations, "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means

to accomplish them."   Overton v. Bazzetta, 539 U.S. 126, 132 (2003).   "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."   Id.

The first consideration is whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.

> "[P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."

Thornburgh v. Abbott, 490 U.S. 401, 408 (citing Procunier v. Martinez, 416 U.S. 396, 404-405 (1974)).   "We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security.'" Murphy, 372 F.2d at 983 (quoting Goff v Graves, 363 F.3d 543, 549 (8th Cir. 2004)). This Turner factor requires the Court to "determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective."   Thornburgh, 490 U.S. at 414.

In this case, MDOC's regulations limit an inmate placed in segregation for significant discipline and behavior problems to five pounds of legal materials in his cell at any one time, and require all other legal materials be stored separately in a legal bin, that fits into two footlockers assigned to the inmate.   See McComb Aff., ¶ 17, Exs. F, p. 5; G, p. 2.   The ACU Handbook provides that an inmate on disciplinary segregation status in the ACU is allowed to access their legal bin once a month upon written request to staff. Id., Ex. H, p. 9.   Inmates are allowed to rotate the five pounds of legal materials they want

to possess in their cells.  Id., ¶ 23.  If an inmate is involved in active litigation, an exception may be made to the policy to allow the inmate to rotate his materials into his cell more frequently, upon written request.  Id.

This limitation on the amount of property a high security risk offender is allowed to keep in his cell is designed to prevent those with a significant history of violating facility rules and engaging in disruptive, threatening or violent conduct from hiding contraband, accessing combustible materials or items that can be converted into weapons.  Id., ¶ 18.

"[The Eighth Circuit has] recognized institutional security as "the most compelling governmental interest in a prison setting.""  Goff, 362 F.3d at 549 (quoting Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996)); see also Overton, 539 U.S. at 133 ("The regulations promote internal security, perhaps the most legitimate of penological goals."). Preventing the hiding of contraband, fires and limiting the amount of items inmates can convert in to weapons goes to ensuring institutional security.  See, e.g., Rust v. Grammer, 858 F.2d 411, 414 (8th Cir. 1988) (reducing risk of fire by removing combustible items from cells considered to be an "important penological objective").

The fact that to date no contraband has been found in plaintiff's cell among his papers or that he has stacked his legal materials under his cement bunk bed without incident does not lead this Court to conclude that the prison policy is not rationally related to a legitimate policy.

> [T]o the extent that access to all legal materials may not be immediate and an inmate's access to the courts is burdened, there is a rational basis for the restrictions. Plaintiff has provided nothing to counter defendants' argument that the regulations are related to fire safety and minimizing contraband and that these are legitimate penological concerns. The regulations at issue balance the inmate's access to legal materials with these concerns by allowing legal papers to be kept in the cells but setting a maximum on the amount of paper. Thus, even if the restrictions burden a

constitutional right, they are reasonable restrictions rationally
related to a legitimate penological concern and are, therefore,
constitutional.

Murphy v. Dowd, 757 F. Supp. 1019, 1021 (E.D. Mo. 1990), aff'd. 938 F.2d 187 (8th Cir.),

cert. denied, 112 S.Ct. 603 (1991).   Thus, even if MDOC's restrictions on the amount of

legal materials an inmate may keep in his cell may be a burden, they are reasonable

restrictions rationally related to a legitimate penological concern and are, therefore,

constitutional.

As to the second factor – whether there are alternative means of exercising the

right – the Court finds that such alternatives exist given that plaintiff may exchange his

legal materials on a monthly basis or more frequently, if needed.   See Overton, 539 U.S.

at 135 ("Alternatives. . .need not be ideal, however; they need only be available.").

Further, to the extent that his storage bin is full, plaintiff has the ability to send legal

materials to his daughter and retrieve them if needed.   Indeed, the evidence is that

plaintiff has allowed defendants to destroy unnecessary legal materials or to send them to

his daughter.   See McComb, ¶¶ 19, 25.

The third factor is the impact an accommodation of the constitutional right will have

on guards and other inmates, and on the allocation of prison resources generally.

"When accommodation of an asserted right will have a significant 'ripple effect' on fellow

inmates or on prison staff, courts should be particularly deferential to the informed

discretion of correction officials."   Turner, 482 U.S. at 90.   Here, if plaintiff were

permitted to maintain unlimited amounts of legal material in his cell, other inmates would

want to do the same.   Allowing inmates with the highest risk classifications and

significant disciplinary history to accumulate as much property as they want in their cells,

legally related or not, creates a condition where contraband could be readily concealed

and has a concrete impact on the safety of inmates, staff and the public at large.

19

Allowing inmates to keep unlimited materials in storage, given limited space, is not possible and could result in certain inmates taking up the storage space of other inmates. Allowing inmates unlimited access to their legal bins whenever they want would cause a strain on the availability of staff.   See Overton, 539 U.S. at 135 (citing Turner, 482 U.S. at 90) ("Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are 'particularly deferential' to prison administrators' regulatory judgments.").

Finally, ready alternatives for accommodating plaintiff's interest at a de minimis cost are not available.

> This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."

Turner, 482 U.S. at 90-91.   See also Overton, 539 U.S. at 136 ("Turner does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal.").   No alternatives, much less readily available alternatives, have been proposed by plaintiff to meet his desire for unlimited access to unlimited amounts of legal materials in his cell, while at the same time addressing the safety concerns raised by defendants, including the limited space of prison facilities and the constraints on staff resources.

Based on its examination of the Turner factors, this Court concludes that the limitations on the amount of legal materials that plaintiff can possess in his cell are

reasonably related to legitimate penological interests.

The Court also finds that plaintiff's claim that he was transferred in order to impede his access to the courts is not likely to succeed on the merits.  Federal courts have repeatedly recognized that unwanted prison transfers and segregated confinement are normal and expected experiences of prison life, and they are not the type of "atypical and significant hardship" that implicate constitutionally protected liberty interests.  See Olim v. Wakinekona, 461 U.S. 238, 250 (1983) (prison authorities "may transfer a prisoner 'for whatever reason or for no reason at all' "), (quoting Meachum v. Fano, 427 U.S. 215, 228 (1976); Freitas v. Ault, 109 F.3d 1335, 1337 (8th Cir. 1997) (prisoner had no constitutionally protected liberty interest in remaining in a less restrictive prison environment, and he therefore was not entitled to due process before being transferred to a more restrictive institution); Portley-El v. Brill, 288 F.3d 1063, 1065 (8th Cir. 2002) ("administrative and disciplinary segregation are not atypical and significant hardships..."); Callender v. Sioux City Residential Treatment Facility, 88 F.3d 666, 668-69 (8th Cir. 1996) (prisoner was not entitled to due process before being transferred from a work release facility to far more restrictive housing in a state reformatory); Moorman v. Thalacker, 83 F.3d 970, 971 (8th Cir. 1996) (due process not required before effecting prisoner's transfer from minimum security facility to maximum security facility). However, prison officials may not transfer an inmate to a less desirable facility because they attempt to exercise some constitutional right.  See, e.g., Goff v. Burton, 7 F.3d 734, 737 (8th Cir.1993) ("a prisoner cannot be transferred in retaliation for the exercise of a constitutional right"), cert. denied, 512 U.S. 1209 (1994); Murphy v. Missouri Dept. of Correction, 769 F.2d 502, 503 (8th Cir. 1985) ("[w]hile a prisoner enjoys no constitutional right to remain in a particular institution and generally is not entitled to due process

protections prior to such a transfer..., prison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution").

In order to sustain a retaliation claim, a prisoner must show that the primary purpose of the defendant's alleged retaliatory action was to punish the prisoner for attempting to exercise his constitutional rights. As explained by the Eighth Circuit, "[t]o succeed on a claim of retaliatory transfer or retaliatory discipline, an inmate must prove that, but for an unconstitutional retaliatory motive, the transfer or discipline would not have occurred." Johnson v. Esry, No. 98-2573, 2000 WL 375269 at *1 (8th Cir. 2000) (per curiam). Thus, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive. See Kind v. Frank, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); Sisneros v. Nix, 95 F.3d 749, 752 (8th Cir.1996) ("[i]n a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred'") (quoting Goff, 7 F.3d at 738); Hazen v. Reagen, 16 F.3d 921, 926 (8th Cir. 1994) ("for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred 'but for' the retaliatory reason").

Given plaintiff's classification level, the offense for which he was convicted and his extensive disciplinary record, the Court cannot find that he would not have been transferred to MCF-OHP (as the only level 5 facility in the state), but for his petitioning the courts for relief.

For all of these reasons, the Court finds that plaintiff is not likely to succeed on the merits of his access to the courts or retaliatory transfer claims and his motion for a preliminary injunction should be denied.

### 3. Balance of the Harms and Public Interest.

Plaintiff has not provided sufficient evidence that he is being precluded from meaningful access to the courts.   On the other hand, allowing plaintiff to have unlimited papers in segregation and interfering with the decisions of transferring inmates by the MDOC would constitute a dangerous intrusion by the Court into prison administration. Such court interference could negatively impact prison safety and resources, which is not in the public interest.   Thus, these factors also weigh in favor of denying the request for injunctive relief.

### C. Conclusion

Based on analysis of the Dataphase factors set forth above, this Court finds that plaintiff's Motion for a Restraining Order [Docket No. 50] and Motion for a Protective Order [Docket No. 51] should be denied.

## II. MOTION FOR DECLARATORY JUDGMENT

Plaintiff has filed a motion declaratory judgment, "declaring Plaintiff's Sovereign Nationality and de jure nationality. . . ."  See Docket No. 78.  Along with his motion, plaintiff filed a pleading titled "DECLARATION OF SOVERIGN NATIONALITY."  See Docket No. 80.  As a part of this declaration, plaintiff asserted that he is "Natural-Born, Free, Human Male, a living breathing Man, Sovereign Citizen, de jure national, sui juris, a mortal man with sentient and moral existence from Our Creator God Almighty and a 'Sovereign Inhabitant Upon the Lands Sojourning."  Id.  According to plaintiff, he had filed and recorded this declaration with several state and federal entities.  Id.  Plaintiff's

motion and supporting materials are a nonsensical combination of legal and nonlegal jargon.

As best as this Court can discern, plaintiff is seeking based on his "Sovereign Nationality" and his status a sovereign foreign state: (1) an accounting by Minnesota for all exculpatory and inculpatory evidence, presumably regarding him; (2) a declaration of the system of law under which the State of Minnesota is operating and how that system of law applies to him; (3) a finding that the courts do not have jurisdiction over his person; (4) a finding that the state court exceeded its jurisdiction with regards to him as he had not waived his sovereign nationality or immunity and thus, any case brought against him was not authorized; and (5) he should be released from his illegal and unconstitutional punishment.   See Docket 80-1, p. 4; Affidavit in Support of Motion for Declaratory Judgment [Docket No. 81], ¶¶ 17-20, 40-43.   In his brief in support of this motion, plaintiff argued that because he has declared his sovereignty, the defendants in this action lack jurisdiction over him and because he is a sovereign state he retains immunity from prosecution and punishment under the law of the state and federal governments.   See Brief in Support off Motion for Declaratory Judgment Memorandum of Law [Docket No. 82], pp. 1-2.   According to plaintiff, it is the duty of this Court to enforce his "expatriation."   Id., pp. 3-5.

In their response, defendants argued that plaintiff's motion seeks to declare him a sovereign based on documents created by him in order to escape the consequences of a criminal conviction.   See State Defendants; Memorandum in Opposition to Plaintiff's Motion for Declaratory Judgment [Docket No. 84], p. 3.   Defendants maintained that such an incomprehensible theory has been rejected numerous times throughout the country.   Id., pp. 3-4.

In his reply, plaintiff asserted that defendants have no authority to confine him through an illegal and unconstitutional criminal conviction. <u>See</u> Plaintiff's Reply Memorandum in Opposition to Defendants' Motion for Declaratory Judgment [Docket No. 97], p. 1. Plaintiff noted that to the extent that he is asking for an order questioning the legality of the Minnesota criminal conviction against him and MDOC's authority to imprison him, such a request falls within the scope of his § 1983 action. <u>Id.</u>, p. 2. Plaintiff also asserted that the right to expatriate himself and relinquish his citizenship is established. <u>Id.</u>, pp. 2-3.

The gravamen of plaintiff's motion declaring his sovereign immunity and seeking expatriation, is to obtain a finding that his conviction and present incarceration are illegal. The United States Supreme Court has held that "[t]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid . . . a [42 U.S.C.] 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . ." <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994). A prisoner cannot bring a civil suit that would "call into question the lawfulness of [his] conviction or confinement" (<u>id.</u> at 483); consequently, a prisoner is barred from bringing a civil rights action to challenge the fact or duration of his incarceration. <u>Id.</u> at 487. In sum, in a civil rights action, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." <u>Id.</u> at 487. Here, the main thrust of plaintiff's motion is to

exempt him from incarceration based on a state conviction.   This he cannot do.   The Court concludes that the motion must be denied as barred by Heck and cannot fall within the rubric of his § 1983 action.

Further, any argument by plaintiff that he is not subject to the laws of Minnesota or the United States because he is a "Sovereign Citizen" is frivolous.   See United States v. Jagim, 978 F.2d 1032, 1036 (8th Cir. 1992) (concluding that defendant's argument that he was a citizen of the "Republic of Idaho" and not a U.S. citizen and therefore outside the jurisdiction of the United States was "completely without merit" and "patently frivolous"); see also United States v. Hilgeford, 7 F.3d 1340, 1342 (7th Cir. 1993) (rejecting the "shop worn" argument that a defendant is a sovereign and is beyond the jurisdiction bounds of the district court); M&I Marshall & Ilsley Bank v. Glavin, NO. 10-CV-616-SLC, 2011 WL 322663 at *1 (W.D. Wis., Jan. 31, 2011) ("Defendant does not provide plaintiff's citizenship, but he argues that his citizenship cannot be the same as plaintiff's because he is a 'real sovereign sentient man, a citizen of the Wisconsin Republic ... and not a citizen of the De facto Federal State of Wisconsin.' This 'sovereign citizen' argument has been rejected repeatedly by courts.") (citation omitted); Klaudt v. Dooley, NO. CIV 10-4091-KES, 2010 WL 5391571 at *4 (D.S.D. Dec. 22, 2010) ("'A person found within the United States cannot somehow exempt himself or immunize himself from the application of state law . . . by declaring himself a non-citizen.'") (quoting Estate of Casimir v. New Jersey, No. 09-4004, 2009 WL 2778392 at *5 (D.N.J. Aug. 31, 2009) (holding that a criminal defendant's purported expatriation did not prevent a state court from exercising jurisdiction over him)); Ritz v. Jordan, NO. CIVA 08CV01164CMAKLM, 2008 WL 5273091 at *2-3 (D. Colo. Dec. 17, 2008) (rejecting the argument that an individual was exempt from state and federal tax law because of a "self-selected" citizenship status as

frivolous).

For all of the reasons stated above, plaintiff's motion for declaratory judgment should be denied.

## III.   MOTION FOR PROTECTIVE ORDER [DOCKET NO. 88]

### A.    <u>Factual and Procedural Background</u>

The basis of plaintiff's motion is as follows: (1) defendants have refused to provide him with legal supplies, such as envelopes, photocopies and paper; (2) defendants will not allow him to send multiple letters and envelopes in one envelope so others outside of the prison can forward the letters on to others; (3) defendants are improperly seizing papers they believe are involved with illegal UCC filings; (4) defendants have not provided him with access to notary services; and (5) defendants have denied him due process during his disciplinary hearing because they refused to call his witnesses during the hearings.   <u>See</u> Plaintiff's Memorandum of Law [Docket No. 90], pp. 1-5.   Plaintiff argued that he is threatened with irreparable harm to his right to access to the courts, because if he is not allowed to receive legal supplies from defendants, he cannot access the courts.   <u>Id.</u>, p. 6.   The relief requested by plaintiff is temporary restraining or order or preliminary injunction.   <u>Id.</u>, pp. 5-6.

In support of his motion, plaintiff submitted an affidavit [Docket No. 91], in which he set out multiple problems he has encountered that he claims interfere with his right to access the court: the requirements of this Court and the Local Rules that he a serve a copy of all communications and pleadings on defendants and that he provide the Court with two copies of pleadings is difficult given the five-pound rule and defendants' refusal to provide him the supplies necessary to comply with that requirement (<u>id.</u>, ¶¶ 7-9, 30, 33); he is only allowed 35 pages of photocopies per week (<u>id.</u>, ¶ 17); he is not given a sufficient amount of paper, envelopes and additional supplies and photocopies must be

approved by the warden or the designee (id., ¶¶ 16, 26, 33); defendants continue to seize legal documents that are signed with the words "without prejudice," and legal documents signed by him with the title of "Pastor" (id., ¶¶ 34, 41); defendants do not allow him to send multiple letters in a single envelope to a third party to distribute (id., ¶¶ 32, 37, 39); defendants refused to send out completed United States Marshal Service forms because they weighed in total more than 13 ounces (id., ¶ 27); defendants will not provide him with legal supplies as it relates to his state conciliation court cases (id., ¶ 25); and he is not being provided with notary services (id., ¶ 35).

For relief, plaintiff asked this Court order defendants to provide him with the legal supplies as requested in a timely manner to comply with this Court's pretrial scheduling order; to allow him to have over 5 pounds of legal materials in his cell; to allow him to send multiple letters in one envelope to be delivered to multiple people; to stop seizing and destroying documents marked with the words "without prejudice" or the title "Pastor;" and to permit him to send legal documents to his friends to have photocopies made and to have them placed in the mail for delivery to the courts and other intended recipients.   Id., p. 6.

Defendants opposed plaintiff's motion, arguing that plaintiff could not show a threat of irreparable harm if the injunction were not granted.   See Memorandum of Law in Opposition to Plaintiff's Motion for a Restraining Order and an Order for Protection [Docket No. 98]("Def.'s Mem."), p. 9.   Defendants asserted that plaintiff is not likely to prevail on the merits on an access to the courts claim, as he has not demonstrated that he was precluded from enforcing a legal right (i.e., that he has missed or inevitably will miss a critical filing deadline).   Id., pp. 10-11.   Defendants also contended that the five-pound limitation on legal materials allowed in a cell for inmates in segregation is reasonably

related to the penological interest of allowing easier searches in cells and to prevent fires, and where plaintiff is periodically permitted to determine the papers he wanted to maintain in his cell.   Id., pp. 13-14.

Turning to the substance of plaintiff's complaints, as to the restrictions on supplies and envelopes, defendants indicated that an indigent inmate with less than $1 in his account receives three envelopes, 35 sheets of writing paper, 35 photocopies and a pen per week, and may request additional supplies and envelopes if they are needed for litigation.   See Second Affidavit of Mary McComb ("Second McComb Aff.") [Docket No. 99], ¶¶ 6, 7, Ex. B (MDOC 300.140).[8]   The purpose for placing limits on supplies and envelopes is to encourage inmates to work (work includes treatment and education assignments), for which they get paid, and self-sufficiency – objectives which are tied to the MDOC's goal of rehabilitation.   Id., ¶¶ 8, 9.   Plaintiff, like other offenders who are in segregation due to misconduct, is not paid and is largely indigent.   Thus, providing unlimited envelopes and supplies to him would diminish the consequences for his misconduct.   Id., ¶ 10.

As for the regulations bearing on outgoing mail, defendants explained that MDOC Division Directive 302.020 provides that "[a]ll outgoing offender material will be identified as being mailed from a correctional facility.   Id., Ex. C, ¶ K(6).   The purpose of identifying the correctional facility is to provide information to the recipient that can warn against fraud.   Id., ¶ 12.   In addition, the facility needs to know to whom a piece of mail is

---

[8]   Such a request must be submitted via an Indigent Offender Supply Request form and identify the purpose for which the supplies will be used, the Court case and number, the deadline for submission, including in some instances documentation of the deadline, and if additional envelopes are requested, the address to which the envelopes will be sent.   If the request for additional envelopes is granted, MDOC staff will address the envelope for the inmate based on the information provided by the inmate on the form to insure that the envelopes are used for legal purposes and not some other purpose. Second McComb Aff., ¶ 7.

sent.  Id., ¶ 13.   Correspondence between inmates is read to identify plans for misconduct or criminal activity, whereas incoming mail from the outside is only scanned. Id.  If an offender encloses a letter to another inmate in an envelope mailed to a third party and the third party then sends the letter to that other inmate, the offender will elude the additional scrutiny directed to inmate-to-inmate correspondence.  Id.  Plaintiff has done this before.   Id.   Additionally, offenders who use third parties outside of the facility to mail items to others outside the prison do so to disguise the fact that correspondence is coming from a prison and as a tactic to engage in unauthorized or fraudulent business enterprises.  Id., ¶ 14.

Regarding their refusal to allow plaintiff to use the title "Pastor" on his correspondence or filings, defendants explained that to prevent persons who communicate with an offender from being misled, prisoners are not allowed to use a business name or position title when sending or receiving mail.  Id., ¶ 15, Ex. C, p. 2. Defendants argued that these policies are rationally related to the prison's interest of ensuring that inmates are not engaging in fraud or scams by mail and to promote institutional safety.  See Def.'s Mem., pp. 19-21.  In addition, defendants claimed that plaintiff has the ability to receive and send mail as long as he complies with policy.  Id., p. 21.

As for the other elements for an injunction, defendants argued that the balance of harms and public interest favors the denial on plaintiff's motion.  Id., pp. 21-22.

In reply, plaintiff asserted that he seeks to send mail to his family and friends to forward to others because he does not have sufficient envelopes to exercise his free speech.  See Plaintiff's Reply Memorandum in Opposition to Defendant's Response to Plaintiff's Motion for a Restraining Order and an Order for Protection ("Pl.'s Reply")

[Docket No. 107], pp. 2, 5.   Plaintiff contended that he has suffered irreparable harm due to a lack of adequate supplies and the prison's refusal to mail legal materials, which has resulted in the dismissal of several of conciliation court proceedings.   Id., p. 3 (citing Docket No. 108, Attachments 1-15).   Plaintiff noted that it is impossible for him to prove that defendants have seized, stolen and destroyed his legal papers.   Id.

Plaintiff explained that he is not seeking to house all of his legal papers in his cell, but because the Federal Rules and Local Rules alone consume the 5-pound limit, he is unable to timely access any other legal materials needed to research, prepare, file, and answer pleadings in the present case in a timely matter.   Id., p. 4.[9]   Plaintiff also submitted that he has provided MDOC staff with the pretrial scheduling order in this case to show that he is engaged in active litigation and the deadlines set by the Court.   Id., p. 5.   Nevertheless, defendants have denied all of his requests for indigent legal envelopes and photocopies and have refused to staple his pleadings.   Id.

Plaintiff argued that he will prevail on the merits on his First Amendment claim. Just as Muslims are allowed to use their religious title in their names on mail, Christians also should be permitted to do so, and denial of this right amounts to a violation of his free exercise of religion.   Id.   Further, as all outgoing mail must be in a MDOC envelope that identifies the correctional facility and the identity of the offender, and all outgoing mail is

---

[9]     Plaintiff correctly noted that the operative scheduling order requires papers associated with responses to nondispositive and dispositive motions to be served and filed within certain timeframes – 14 days for nondispositive motions, 21 days for dispositive motions, and 14 days for replies for dispositive motions.   [Docket No. 76]. According to plaintiff, he cannot effectively refer to the Court rules, prepare and write up his replies and pleadings, obtain the required photocopies, and mail them to the Court to meet a 14-day deadline without keeping the documents in his cell.   Pl.'s Reply, p. 4.   As discussed at the end of this Report and Recommendation, the Court has concluded it can address the time constraint issues raised by plaintiff by modifying the pretrial scheduling order to give the parties more time to respond to motions.

inspected, placing multiple envelopes in one envelope so that the recipient of the outside envelope can mail the enclosed envelopes to others does not violate MDOC's policy.   Id. In any event, once the conforming mail leaves the facility, it is no longer MDOC's concern. Id.   Plaintiff submitted that the balance of harms weighs in his favor where defendants have not shown he has used the mail for any scams or illegal activities and the public interest favors protecting the constitutional rights of prisoners.   Id., pp. 5-6.

**B.   Analysis**

Plaintiff's motion is titled a motion for a protective order, but his requests for relief and argument seek injunctive relief.   Consequently, this Court will treat this motion as a motion for a preliminary injunction and will apply the Dataphase factors discussed in connection with Plaintiff's Motion for a Restraining Order [Docket No. 50] and Motion for a Protective Order [Docket No. 51].   See Section I, supra.

**1.   Threat of Irreparable Harm**

The Court concludes that plaintiff has not shown any threat of irreparable harm because again he has not presented evidence of any actual injury in connection with the instant suit or any other suits in which he is challenging his sentence or conditions of confinement.   As set forth in Section I, supra, none of the MCF-OPH's actions regarding the quantity of legal materials plaintiff can retain at any one time in his cell, limitations on supplies, photocopies and envelopes, or lack of notary services have had any impact on his access to or ability to prosecute his claims in this Court.

Concerning plaintiff's request that he be permitted to submit letters in one envelope to a third party so they can be re-sent to others or his request that he be allowed to submit his pleadings with his the title of "Pastor" or the words "without prejudice,"[10] the

---

[10]   This Court notes that plaintiff has used the language "without prejudice" in many of the filings with this Court.   Without knowing which documents were allegedly seized by

Court also concludes that the prison's prohibition of these activities does not pose a threat of irreparable harm to his access to the courts.   As evidenced by his copious submissions to the Court, plaintiff has adequately demonstrated the ability to communicate with the Court and file numerous motions and requests for relief. [11] Further, defendants have in place a method to allow plaintiff to obtain additional supplies, envelopes and photocopies to the extent that he needs to file pleadings in this case. Second McComb Aff., ¶ 7. [12]

Further, any state court proceedings that plaintiff claims have been dismissed, allegedly because of the prison's regulations, cannot sustain a claim of irreparable harm because there is nothing before this Court to suggest that these actions relate to a claim challenging his sentence or conditions of confinement. [13]   As best as this Court can tell

---

defendants because of this phrase, the Court can make no determination as to what injury, if any, resulted from the seizure of documents using the phrase.

[11]   Plaintiff asserts that he was not allowed to send summons forms to the United States Marshals in May 2011.   Duwenhoegger Aff., ¶ 27, A-13.   However, the docket in this case shows that between May and June of 2011, the summons were issued, service papers were sent to the Marshals and the Summons were returned executed as to the majority of the defendants.   See Docket Nos. 55-57, 106.

[12]   As discussed at the end of this Report and Recommendation, the Court will remove the requirement that plaintiff provide the Judge and Magistrate Judge with two courtesy copies of his pleadings and submissions.

[13]   Plaintiff asserted in his reply that the defendants' conduct resulted in him losing his ability to prosecute his conciliation court matters.   In support, plaintiff cited to the attachments [Docket No. 108] to his reply.   On October 12, 2011, the Washington County District Court issued orders denying plaintiff's demand for removal/appeal concerning several conciliation court matters submitted on September 20, 2011 on the basis that plaintiff had submitted his informa pauperis form on October 10, 2011, past the appeal date of September 22, 2011.   See Attachments 8, 10, 12.   Plaintiff provided this Court with copies of the jury trial demand and demand for removal regarding the conciliation matters.   See Attachments 1-6.   Plaintiff also enclosed an undated letter, enclosing informa pauperis forms from a Melissa Lee who notified plaintiff that he needed to submit IFP forms and that he needed to submit the forms by October 7, 2011.   See Attachment 13.   Plaintiff also attached a September 22, 2011 letter from the MDOC's

from the exhibits submitted by plaintiff, he has or had several conciliation court cases pending and defendants have denied him indigent supplies regarding some of these matters.   See Docket No. 92, A-16, A-34.   However, the Court is at loss to understand how a conciliation court can provide plaintiff any relief regarding his incarceration or conditions of confinement.   See generally, Minn. Stat. § 491A.01.   In any event, even if there may be some impact on his conciliation court cases due to the refusal of MDOC staff to provide him more than the weekly allotted supplies, such an inconvenience does not amount to a violation to his right to access the courts.   See Lewis, 518 U.S. at 356.[14]

In summary, this Court concludes that plaintiff has not the met the first prong for injunctive relief because the record does not establish a threat of irreparable harm.

## 2.    Likelihood of Success on the Merits.

This Court also finds that plaintiff is unlikely to succeed on the merits of his access to the court claim.

---

associate general counsel, stating that while an envelope containing a letter indicating that enclosed therein were the Demand for Removal, Affidavit of Good Faith, and Affidavit of Service, the envelope did not contain those documents.   See Attachment 15.   Finally, plaintiff relied on a September 28, 2011 denial of delivery notice, which denied the sending of an envelope on the basis an envelope had been sealed, even though it was allegedly legal mail.   All this Court can surmise from this evidence is that while plaintiff was ultimately able to timely file his jury trial demand and demand for removal regarding the conciliation matters, he failed to timely file the necessary informa pauperis forms. There is no evidence that defendants' actions or inactions caused this error.

[14]     Similarly, any refusal to allow plaintiff to send materials to the Minnesota Secretary of State to perfect his sovereignty does not amount to a violation of his right to access the courts.   See Duwenhoegger Aff., ¶ 40; Jones v. Caruso, 569 F.3d 258, 269 (6th Cir. 2009) ("The documents set forth in Defendants' Exhibit C in support of their Motion for Summary Judgment do not constitute 'legal mail' either. [ ] Because those documents all relate to the administrative process of perfecting a security interest and enforcing that interest through the Secretary of State's office, and they do not implicate Jones's constitutional right of access to the courts, they are not entitled to greater First Amendment protections.") (citing Sallier v. Brooks, 343 F.3d 868, 876 (6th Cir. 2003)).

First, the Court concludes that defendants' actions and policies were rationally related to legitimate government interests.[15]   Concerning limiting supplies, defendants represented that limiting free supplies fosters rehabilitation by encouraging inmates to comply with rules so that they can earn money and purchase the supplies they need. Second McComb Aff. ¶¶ 8-10.   Inmate rehabilitation is a legitimate penological interest. See Dawson v. Scurr, 986 F.2d 257, 260 (8th Cir.1993).

This Court finds that limiting supplies, papers and envelopes to an inmate in disciplinary segregation is rationally related to inmate rehabilitation.   If an inmate in segregation can receive unlimited supplies, this would eliminate one of the inducements designed to encourage him to follow prison regulations and the conduct himself appropriately, and the incentive to earn the right to engage in work or an educational program to secure money for supplies.

Further, prohibiting plaintiff from enclosing multiple letters in one envelope addressed to an individual so they can be re-sent to others (even assuming the all constitute legal materials), and precluding him from submitting his papers with the title of

---

[15]      As it relates to providing notary services, MDOC provides: "[n]otaries public will not witness or notarize documents that contain an oath written by the offender.   The only valid oath/affirmation is provided in this policy and on court-produced forms."   See MDOC  106.025,  ¶  C(8),  http://www.doc.state.mn.us/DocPolicy2/html/DPW_Display_ TOC.asp?Opt=106.025.htm.   Defendants have refused to provide notary services for documents because plaintiff asked them to notarize a document that contains an oath written by him.   See Docket No. 93, A56-A58, A63-A64.   Defendants have not provided a rationale for this requirement.   However, a refusal to provide notary does not hinder plaintiff's ability to litigate the present action.   Under 28 U.S.C. § 1746, a person need not appear before a notary public to make a declaration in federal court subject to penalties of perjury if the statement concludes with a final paragraph stating:

> "I declare under penalties of perjury that the foregoing is true
> and correct. Executed on (insert date ).
>         (Signature)"

28 U.S.C. § 1746(2).   In lieu of affidavits, plaintiff may submit declarations using this language with this Court in connection with any of his submissions.

"Pastor," are rationally related to the legitimate interests of facility security and public safety.   It is in the public's interest to know if the mail they are receiving is coming from an incarcerated individual, and control of inmate communications with other inmates is paramount to facility safety.   Thus, even if all outgoing mail is inspected for contraband and is in conformance with policy requiring that the envelope show the identity of the sender and the correctional facility, there is nothing to stop the initial recipient of the outside envelope from removing the contents of the enclosed envelopes and placing those contents in other envelopes to be sent to third parties without the required information that the mail has been sent from a prisoner and the prisoner's correctional facility.   Similarly, there is an interest in preventing illegal and vexatious filings and ensuring that people are not taken advantage of merely because an inmate is or claims to be a pastor.

Second, the Court finds that there are alternative means available to plaintiff to obtain adequate legal supplies, including papers, envelopes and copying, to allow him to exercise his right to access the courts.   An inmate is not entitled to unlimited access to legal materials, but instead must only be provided meaningful access to the court.   See Myers, 101 F.3d 542, 544 (8th Cir. 1996) ("Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.") (citation omitted); see also Courtemanche v. Gregels, 79 Fed.Appx. 115, 117 (6th Cir. 2003) ("[T]he right of access does not include a per se right to photocopies in whatever amount a prisoner requests.") (citing Bell Bey v. Toombs, No. 93-2405, 1994 WL 105900, at *2 (6th Cir. Mar. 28, 1994); Sands v. Lewis, 886 F.2d 1166, 1169 (9th Cir. 1989)). Here, plaintiff can obtain materials above his weekly allowance, including paper,

envelopes and photocopies, by making a written request.  Plaintiff is aware of the deadlines in this case as set forth by the pretrial scheduling order, and there is nothing impeding him from asking for additional materials in order to ensure that he can provide meaningful pleadings necessary for this case.  <u>See</u> Second McComb Aff., ¶ 7.  To the extent that plaintiff makes a request and provides the necessary information for this case, the Court expects defendants to consider and act reasonably on the request and in good faith.

Third, given the threat to the public and the facility, there are no other readily available alternatives and in any event, plaintiff has not provided the Court with any other alternatives that fully accommodates the prisoner at de minimis cost.

Based on examination of the <u>Turner</u> factors, this Court concludes that the limitations on supplies, prohibition of enclosing multiple envelopes in another envelope for distribution to third parties, and the use of title of "Pastor," are reasonably related to legitimate penological interests and therefore, he is not likely to prevail on his access to court claim.

### 3.    Balancing the Harms and Public Interest

Plaintiff has not provided sufficient evidence that he is being precluded from meaningful access to the courts.   On the other hand, plaintiff's proposed requests could negatively affect prison safety, prison resources and negatively affect public safety. Thus, balancing the harms and public interest, these factors also weigh in favor of denying the request for injunctive relief.

### C.    <u>Conclusion</u>

Based on analysis of the <u>Dataphase</u> factors, this Court finds that plaintiff's Motion for a Protective Order [Docket No. 88] should be denied.

## IV.    OTHER RELIEF

This Court has determined that plaintiff is not entitled to injunctive relief.   At the same time, the Court finds that it can address some of the issues raised by plaintiff by reducing the amount of supplies needed by plaintiff to prosecute the present action and modifying the timeframe for plaintiff's submissions in order to give him ample time to respond to motions filed by defendants.

In particular, contemporaneous with this Report and Recommendation, the Court has issued an Amended Pretrial Scheduling Order that will no longer require plaintiff to submit two courtesy copies of his pleadings and submissions to the Judge and Magistrate Judge.   Plaintiff will still need to serve a copy of his submissions and pleadings on defendants, and files these papers with the Clerk of Court in the time allotted to the parties to respond to any dispositive and non-dispositive motions.

## V.    <u>RECOMMENDATION</u>

For the reasons set forth above, it is recommended that:

1.      Plaintiff's Motion for a Restraining Order [Docket No. 50] be **DENIED**;

2.      Plaintiff's Motion for a Protective Order [Docket No. 51]; be **DENIED**;

3.      Plaintiff's Motion for Declaratory Judgment [Docket No. 78] be **DENIED**; and

4.      Plaintiff's Motion for Protective Order [Docket No. 88] be **DENIED**.


Dated:        February 13, 2012

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**<u>NOTICE</u>**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **March 14, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals