UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JERRY J. DUWENHOEGGER, SR.,                    CIVIL NO. 10-3965 (PJS/JSM)

    Plaintiff,

v.                                             <u>REPORT AND RECOMMENDATION</u>

JOHN KING, et al.,

    Defendants.


JANIE S. MAYERON, United States Magistrate Judge


The above matter came on before the undersigned upon Defendants' Motion for Summary Judgment [Docket No. 170].

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).

## I.     INTRODUCTION

This case arises out of plaintiff's complaint of violations of his civil rights under 42 U.S.C. § 1983 against defendants John R. King, Steven Hammer, Mary M. McComb, Gregory Lindell, Richard Wilson, David Reishus, Sheryl Vezner, Jonathon Weiss, Deborah Schadegg, Jeff Amberg, Deborah Garbison, Scott Behrends, Lana Jensen, David Loetscher, Paul Hoflund, Joseph Hobson, Michael Green, Lisa Rudeen, Shannon Reimann, Christopher Seidler, John Sofie, Nicholas Duffy, Susan Armstrong, Sean Kelly, Courtney Felda, Jenny Carufel, Leigh McCoy, Andrew Leiffort, David Crist, Michael Rogosheske, Daniel Kelley, John Hillyard, Richard Pung, Roger Baburam, Joe

Durocher, and Natalie Leseman (collectively referred to as "defendants"). All defendants were employed by the Minnesota Department of Correction ("MNDOC") and worked for the Minnesota Correctional facility at Stillwater ("MCF-STW") or the Minnesota Correctional Facility in Oak Park Heights ("MCF-OPH"), in such positions as the Warden, Associate Warden, correction officer, hearing officer, program director, librarian and case worker.

Plaintiff was convicted of two counts of conspiracy to commit first-degree murder and was sentenced to consecutive terms of 180 months and 190 months in prison. State v. Duwenhoegger, No. C5-99-1237, 2000 WL 821483 at *1 (Minn. Ct. App., June 27, 2000). Relevant to the facts in this case, plaintiff was incarcerated at MCF-STW from December 15, 2004 until November 4, 2010, at which time he was transferred to MCF-OPH. See Third Affidavit of Mary McComb ("Third McComb Aff.") [Docket No. 172], ¶ 9. Because of his criminal history and history of disciplinary violations, plaintiff has at all times relevant to this case been classified as a level 5 offender, which is the maximum security level for an offender and indicates that he presents a very high security risk. Id., ¶¶ 8, 10. Plaintiff was transferred back to MCF-STW on December 16, 2011, where he is currently housed in the general population. Id., ¶ 9.

The operative complaint in this case is the Third Amended Complaint dated April 18, 2012 [Docket No. 135]. It is single spaced and 123 pages long. It is structured by an event or series of events associated with a particular defendant; thus, it covers

numerous incidents against numerous defendants over a period of 2006 through 2011.[1] Suffice it to say, the Third Amended Complaint is the antitheses of the requirement under Rule 8 of the Federal Rules of Civil Procedure that plaintiff provide a short and plain statement of the claims that set forth the basis of the relief he seeks.

Having poured over this epistle ad nauseam, the Court has identified several recurring challenges to plaintiff's incarceration, extended incarceration, placement into segregation and denial of privileges at MCF-STW and MCF-OPH including the supplies given (or refused) to plaintiff; inspection and confiscation of his mail; inspection and confiscation of materials bearing on false UCC filings and liens; prohibition of the use of the title "Pastor" in mailings to and from him; search and seizure of property in his cell; the handling of grievances filed by and against plaintiff; retaliation for exercising his lawful rights; and being treated differently from other inmates. While on many occasions plaintiff did not set forth the legal grounds upon which he was seeking relief for a particular incident against a particular defendant, on those occasions where he did, he alleged violations of his rights to due process, access to the courts, freedom of religion and speech, and to be free of cruel and unusual punishment.[2]

---

[1]     Instead of consecutively numbering each paragraph, plaintiff titled each claim against each defendant "IV – Statement of Claim" and then numbered each paragraph under each Statement of Claim 1, 2, 3, etc. To assist the Court, defendants took it upon themselves to consecutively number each paragraph of the Third Amended Complaint starting with the number 1 and ending with the number 763. This numbered version of the Third Amended Complaint is attached to the Affidavit of Kelly S Kemp [Docket No. 143] as Exhibit A. Consequently, when referencing allegations in the Third Amended Complaint, the Court cites to the paragraphs of Docket No. 143.

[2]     To the extent that plaintiff identified provisions of the United States Constitution in support of his claims, he often cited to various amendments which had no bearing on his claims (e.g. Fourth, Fifth, Sixth, Ninth, and Tenth Amendments).

The present matter comes before the Court on defendants' Motion for Summary Judgment.

## II.      STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999). "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N.D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995). "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a

4

genuine issue for trial." <u>Minnesota Laborers Health & Welfare Fund v. Swenke</u>, 2003 WL 21521755 *1 (D.Minn. July 2, 2003) (citations omitted). The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." <u>Wilson v. Int'l Bus. Mach. Corp.</u>, 62 F.3d 237, 241 (8th Cir. 1995).

Summary judgment is appropriate where the material facts are not in dispute, and the court need only apply the law to the facts in the record. <u>See</u> <u>Eisenrich v. Minneapolis Retail Meat Cutters</u>, 282 F. Supp. 1077, 1080-81 (D. Minn. 2003) (citing <u>Oldham v. West</u>, 47 F.3d 985, 988 (8th Cir. 1995)).

## III.  ANALYSIS[3]

### A.  <u>Whether Plaintiff's Claims Against Defendants are for Actions Taken in their Official Capacities</u>

Defendants argued that public employees can be sued in a § 1983 action in an official capacity, individual capacity, or both, but here, plaintiff failed to expressly allege in his Third Amended Complaint that he was suing them in their personal capacities. <u>See</u> Memorandum in Support of Summary Judgment on Behalf of Defendants ("Defs.' Mem.") [Docket No. 171], p. 21. As such, defendants contended that plaintiff is not entitled to any compensatory damages or punitive damages against any defendant in their individual capacity, since a claim against a state employee in his official capacity

---

[3] As this Court noted in the Introduction, plaintiff has sued 36 individuals for their conduct in connection with numerous incidents taking place over a period of five years. Plaintiff's 123-page, single-spaced Third Amended Complaint is an unmanageable quagmire of claims. The Court decided the only manageable way to address the breadth of these claims was to group them by subject matter, as both defendants and plaintiff did in their respective memoranda, and then determine whether the claims (and the incidents giving rise to those claims) could survive defendants' motion for summary judgment. Thus, the Court addresses the arguments of defendants in the same order as they did in their initial memorandum and as plaintiff did in his response.

constitutes a claim against the state and is barred by the Eleventh Amendment, and defendants in their official capacity are not "persons" for the purposes of § 1983. Id., pp. 20-21.

Plaintiff does not dispute that the Third Amended Complaint does not specify the capacity in which defendants are being sued. Instead, plaintiff argued that he did allege in the original and Second Amended Complaint that he was suing defendants in their individual capacities, and he had also stated he was suing defendants in their individual capacities in his reply to defendants' Answer to the Third Amended Complaint.[4] See Memorandum of Law in Opposition of Summary Judgment on Behalf of Defendants [Docket No. 188] ("Pl.'s Mem."), pp. 9-10.[5] In addition, plaintiff asserted the Eleventh Amendment does not bar damages against defendants in their individual capacities and defendants in their personal capacities are "persons" for the purposes of § 1983. Id., p. 10.

"[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999); see also Artis v. Francis Howell North Band Booster Ass'n., Inc., 161 F.3d 1178, 1182 (8th Cir. 1998) ("If the complaint does

---

[4]     This reply is not reflected on the Court's docket, suggesting it was never filed with the Court. However, even if it was filed, a reply to an answer filed by a defendant that contains no counterclaim is not permitted by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 12(a)(1). As plaintiff knows, the only proper way to amend the Third Amended Complaint is to seek defendants' agreement to allow him to amend the pleading to add new allegations that he was suing them in their individual capacities or to move the Court to amend the Third Amended Complaint to add these allegations.

[5]     When referencing the pages of plaintiff's memorandum, the Court is citing to the pages as numbered by the Court's ECF system and not as numbered by plaintiff.

not specifically name the defendant in his individual capacity, it is presumed he is sued only in his official capacity"); <u>Andrus ex rel. Andrus v. Arkansas</u>, 197 F.3d 953, 955 (8th Cir. 1999) ("if a complaint is silent, or only hints at the capacity in which a state officer is sued for monetary damages, the complaint should be interpreted as an official-capacity claim ....[;][i]n actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be exposed to personal liability") (citing <u>Egerdahl v. Hibbing Community College</u>, 72 F.3d 615, 619 (8th Cir. 1995); <u>Nix v. Norman</u>, 879 F.2d 429, 431 (8th Cir. 1989)).

Plaintiff admits that he has not expressly alleged in the Third Amended Complaint that he was suing defendants in their individual capacities. Further, contrary to his assertions, neither the original nor the Seconded Amended Complaint state that he was suing defendants in their individual capacities. <u>See</u> Docket Nos. 1, 45. Therefore, based on well-established Eighth Circuit jurisprudence, the Court finds that defendants have been sued only in their official capacity. The question then is whether plaintiff can sue the defendants in their official capacities for money. The answer is he cannot.

The Eleventh Amendment states that "the judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." Under the Eleventh Amendment, federal courts lack subject matter jurisdiction over a claim against a state for damages when that state has not consented to the suit. <u>See</u> <u>Kimmel v. Florida Bd. of Regents</u>, 528 U.S. 62, 72 (2000); <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44, 64-65 (1996). When a lawsuit is barred by the Eleventh Amendment, the case must be

dismissed for lack of subject matter jurisdiction. <u>Seminole Tribe</u>, 517 U.S. at 64-65.

Eleventh Amendment immunity also extends to state officials, since "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself." <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989) (internal citations omitted). <u>See</u> <u>also</u> <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 101 (1984) (Eleventh Amendment immunity extends to state officials when the "state is the real, substantial party in interest.") (internal quotation omitted); <u>Treleven v. University of Minn.</u>, 73 F.3d 816, 818 (8th Cir. 1996) (official capacity lawsuits are "essentially 'for the recovery of money from the state.'") (quoting <u>Ford Motor Co. v. Department of the Treasury</u>, 323 U.S. 459, 464 (1945)). Further, neither a State nor its officials acting in their official capacities are "persons" under § 1983. <u>See</u> <u>Will</u>, 491 U.S. at 71 (citation omitted).

Minnesota has not waived its immunity from § 1983 claims. <u>Phillips v. Minnesota State Univ.</u>, Civ. No. 09-1659 (DSD/FLN), 2009 WL 5103233 *2 (D. Minn. 2009). It is also undisputed that the State of Minnesota has not consented to suit. <u>See</u> <u>DeGidio v. Perpich</u>, 612 F. Supp. 1383, 1388-89 (D. Minn. 1985) (recognizing that the State of Minnesota's limited waiver of sovereign immunity from tort actions in state court is not a waiver of Eleventh Amendment immunity from suit in federal court for federal constitutional claims). In addition, it is well-established that Congress did not abrogate the states' immunity by enacting 42 U.S.C. §1983. <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 344 (1979). "This constitutional bar applies with equal force to pendant state law claims." <u>Cooper v. St. Cloud State Univ.</u>, 226 F.3d 964, 968 (8th Cir. 2000).

For all of these reasons, the Court finds that plaintiff has not sued defendants in their individual capacities, and accordingly, defendants are entitled to summary judgment on plaintiff's claims to the extent he is seeking money damages (compensatory and punitive) from defendants them.[6]

## B. Unlawful Incarceration Claims[7]

Plaintiff alleged that his time for incarceration was unlawfully extended in connection with various violations of MNDOC policy for which he was charged and found guilty. The violations at issue are Notice of Violations ("NOVs") 387443, 416844, 418457, 418801, 419151, 419158, 425821, 426155 and 426847 and involved claims that plaintiff had assaulted another inmate (NOV 387443); improperly asked for copies of a fact chronology to be made for federal court (NOV 416844); possessed a clock not

---

[6] The Eleventh Amendment does not bar suits against state officials acting in their official capacities for _prospective_ injunctive relief "to prevent future violations of federal law." Treleven, 73 F.3d at 819 (citing Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995)). Further, "state officials are 'persons' under §1983 when sued for _injunctive_ relief because such actions are not treated as actions against the State." Id. (internal citations and quotation marks omitted) (emphasis added). Therefore, where plaintiff has alleged that conduct by certain defendants is ongoing, the Court will not, as defendants have suggested, unilaterally find that all of the injunctive relief requested in the Third Amended Complaint is not prospective in nature. See Defs. Mem, pp. 21-22. On the other hand, where plaintiff only sought monetary damages by a particular defendant for his or her conduct, or where the conduct is not ongoing and the injunctive relief sought cannot be prospective in nature, then defendants should be granted summary judgment on that claim as to that defendant, as there is no relief that can be afforded plaintiff. For example, plaintiff is currently residing at MCF-STW. Any conduct which plaintiff alleged occurred at MCF-OPH at the hands of a particular defendant cannot be the basis of a request for injunctive relief unless the same conduct by the same defendant is taking place at MCF-STW and could be prospectively enjoined.

[7] In Section B and each subsequent section, every attempt was made to identify the paragraphs of the Third Amended Complaint that bore on the topic under discussion. However, given the way the pleading was organized and the multiple theories plaintiff asserted under each "Statement of Claim," the Court "gave up" this exercise. There simply was no way to insure that all allegations were captured.

on his Commissary list (NOV418308); possessed unauthorized UCC-related documents (NOVs 418157, 425821, 426847); possessed an envelope from an attorney that was not his lawyer (NOV 418151); threatened to file a UCC lien against librarian Garbison (NOV 419158); possessed mail, used stamps and an eyeglass case deemed to be contraband (NOV 418801); and wrote a letter to his daughter containing information regarding another inmate (NOV 426847). <u>See</u> Third Amended Complaint, ¶¶ 3-108, 146-167, 194-202, 271-298, 322-374; Affidavit of Kobie Hudson [Docket No. 173] ("Hudson Aff."), Exs. 2, 3.

Defendants argued that plaintiff's claims for relief based on extended incarceration resulting from all of these NOVs are barred by the doctrine espoused by the United States Supreme Court in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994). <u>See</u> Defs.' Mem., p. 24. According to defendants, in order to bring a § 1983 action challenging an extended confinement, the inmate must first demonstrate that the incarceration has been invalidated by another court, and here, that has not happened. <u>Id.</u>

In response, plaintiff submitted that he has established that his "illegal & unconstitutional incarceration has been reversed, invalidated, expunged & declared invalid by another court." <u>See</u> Pl.'s Mem., p. 11 (citing Plaintiff's Affidavit [Docket No. 189] ("Pl. Aff."), Attach. 1 ("Hearing Findings Report (#A130)").[8] Plaintiff asserted that Hearing Findings Report (#A130) demonstrates that he did not commit the violations alleged for which extended incarceration has been imposed. <u>Id.</u>

---

[8]     According to defendants Hearing Findings Report (#A130) refers to NOV 429673 (renumbered NOV 431265). Reply Memorandum in Support of Summary Judgment on Behalf of Defendants ("Defs.' Reply.") [Docket No. 194], p. 4.

In reply, defendants contended that plaintiff has not established that his incarceration was reversed, expunged, invalidated or declared invalid by another court. See Defs.' Reply, p. 4. While plaintiff asserted that a MNDOC officer decided on one occasion that the MNDOC did not have sufficient evidence to prove a violation of prison discipline rules, defendants argued that the disciplinary proceeding referenced by plaintiff (NOV 429673) was not one of the disciplinary hearings that resulted in an extended incarceration because the hearing officer found in plaintiff's favor. Id.

In Heck v. Humphrey, 512 U.S. 477 (1994), the Supreme Court held that "[t]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid . . . a 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87. Consequently, a prisoner is barred from bringing a civil rights action to challenge the fact or duration of his incarceration. Id. at 483 (citing Preiser v. Rodriguez, 411 U.S. 475, 488-90 (1973)). In a civil rights action, "the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." Id. at 487. The exclusive remedy for a state prisoner challenging the fact or duration of his confinement is a petition for habeas corpus. Preiser, 411 U.S. at 488-90. This rule also applies to prison disciplinary sanctions affecting the fact or duration of confinement. See Edwards v. Balisok, 520 U.S. 641,

645 (1997).

The United States Supreme Court subsequently explained that the <u>Heck</u> rule is meant "to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement--either directly through an injunction compelling speedier release or indirectly through a judicial determination that necessarily implies the unlawfulness of the State's custody." <u>Wilkinson v. Dotson</u>, 544 U.S. 74, 81 (2005). Thus, <u>Wilkinson</u> clarifies that "a state prisoner's § 1983 action is barred (absent prior invalidation)--no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)--if success in that action would necessarily demonstrate the invalidity of confinement or its duration." <u>Id.</u> at 81-82; <u>see also</u> <u>Cooke v. Peterson</u>, Civil No.12-1587 (DSD/JJK), 2012 WL 6061724, at *2 (D. Minn. Dec. 06, 2012) (Doty, J.) ("Cooke argues, however, that <u>Heck</u> is inapplicable because he challenges the HRU decisions that extended his incarceration rather than his court-imposed sentence. The court disagrees. <u>Heck</u> bars a broad class of claims. . . . In the present action, Cooke asks the court to find that the duration of his confinement was invalid. As a result, <u>Heck</u> bars the claim unless Cooke satisfies the favorable termination requirement.") (citing <u>Wilkinson</u>, 544 U.S. at 82).[9] Further, the Supreme Court has made clear that the <u>Heck</u> doctrine is applicable to prisoner procedural due

---

[9] This Court notes that the rule in <u>Heck</u> is not applicable to § 1983 actions challenging "prison disciplinary proceedings in the absence of any implication going to the fact or duration of [the] underlying sentence." <u>Muhammad v. Close</u>, 540 U.S. 749, 754 (2004). As such, any § 1983 claims by plaintiff that his placement in segregation was unlawful, are not barred by <u>Heck</u>, as placement in segregation does not go to the fact or duration of the underlying sentence.

process claims that necessarily implicate the validity of a prison disciplinary sanction. See Edwards, 520 U.S. at 645.

There are nine NOVs that resulted in the imposition of extended incarceration on plaintiff: 387443 (5 days extended incarceration), 416844 (1 day extended incarceration), 418457 (10 days extended incarceration), 418801 (30 days extended incarceration), 419151 (30 days extended incarceration), 419158 (30 days extended incarceration), 425821 (90 days extended incarceration), 426155 (20 days extended incarceration) and 426847 (extended incarceration days 10). See Hudson Aff., Exs. 2-4. Based on this Court's review of the decisions by the MNDOC with respect to each of these NOVs, there is not one instance where the reviewing staff sided with plaintiff by reversing an already imposed sentence of extended incarceration.[10] But more to the point and fatal to plaintiff's position, there is no evidence that any court has reversed the extend incarceration rulings by the MNDOC. Indeed, the only record of court involvement was in response to a state habeas corpus action regarding NOV 376631 (addressing an imposition of segregation as opposed to extended incarceration), which

---

[10] As for Hearing Findings Report #A130 (NOV 429673/341265), cited by plaintiff to support his assertion that he did not commit the violations alleged for which extended incarcerations were imposed, the charges that formed the basis of this violation were disobeying a direct order, abuse/harassment, disorderly conduct, and possession of contraband arising out of various papers confiscated from plaintiff that included UCC forms that could be used to file liens against others. See Pl.'s Aff., Attach. 1. After a "thorough review of the evidence, it was determined [by the hearing officer] that the preponderance of the evidence has not been met. As a result, the charges are dismissed." Id. There is no indication in the record that extended incarceration was ever imposed as a result of this charge. Instead, the record established that this NOV was dismissed with no penalties assessed. Moreover, there is nothing in this decision indicating that the hearing officer had overturned or reversed earlier NOVs where plaintiff had been found to violate MNDOC policies prohibiting possession of UCC related papers that could be used to file liens against others. See Hudson Aff., Exs. 3, 4 (NOVs 416844, 418457, 418801, 419151, 419158, 425821, 426155 and 426847).

was ultimately dismissed by the state court. Id., Ex. 1; Duwenhoegger v. Dingle, NO. A07-1648, 2008 WL 4133515 (Minn. Ct. App. Sept. 09, 2008). While plaintiff maintained that his habeas petition was dismissed because he had already served the punishment, (Pl.'s Mem., p. 12), the Minnesota Court of Appeals specifically found that his due process rights had not been violated. See Duwenhoegger, 2008 WL 4133515 at *3-4.

For all of these reasons, based on the undisputed record, the Court finds that any challenge in the Third Amended Complaint related to the imposition of extended incarceration as a part of a disciplinary hearing is barred by the rule in Heck, and defendants are entitled to summary judgment on these claims.

### C.    Due Process Claims Related to the Imposition of Extended Incarceration, Segregation or Loss of Privileges

The Third Amended Complaint made numerous due process allegations pertaining to discipline in the form of extended incarceration, segregation or deprivation of privileges arising from findings of guilt in connection with numerous NOVs.

As an initial matter, to the extent that plaintiff seeks relief based on a violation of his right to due process pertaining to the imposition of extended incarceration in connection with the nine NOVs discussed above, such claims for relief are barred by Heck. See Report and Recommendation, Section III.B, supra.

With respect to the imposition of other penalties imposed in connection with disciplinary hearings (e.g. segregation or loss of privileges), defendants submitted that plaintiff cannot assert a viable procedural due process claim. First, he cannot establish that he was deprived a protected liberty interest because neither demotion to segregation nor loss of privileges, even without cause, amounts to an atypical and

14

significant hardship so as to trigger any protections afforded by procedural due process. See Defs.' Mem., pp. 27-28. Second, even if plaintiff could show a loss of liberty, he cannot show that he did not receive any process he may have been due. Id., pp. 28-29.

Plaintiff contended that the continuous loss of prison privileges (e.g., loss of telephone privileges, reduced time to shower and loss of prison employment) and the placement into segregation for a period two years, as the result of the penalties imposed upon him from various disciplinary hearings, amounted to an atypical and significant hardship. See Pl.'s Mem., p. 12. In particular, plaintiff represented in his affidavit that he was placed in segregation for two years as a result of allegedly filing a false and fraudulent lien under the UCC against librarian Garbison. See Pl.'s Aff., ¶ 56.

In reply, defendants asserted that plaintiff failed to identify the NOVs in which two years of segregation was imposed; the penalty he received for the Garbison incident was not based on any finding that he had filed a lien against Garbison; and in any event, he did not receive 2 years of segregation for the NOV that related to Garbision. See Defs.' Reply, pp. 6-7 (citing Third McComb Aff. ¶¶ 73-74, Exs. 32-33). In short, for claims involving NOVs where plaintiff received time in segregation, plaintiff cannot establish that he had a liberty interest in remaining in general population. Id., p. 7.

"To prevail on a Fourteenth Amendment due process claim, [a plaintiff] must first demonstrate that he was deprived of life, liberty or property by government action." Orr v. Larkins, 610 F.3d 1032, 1034 (8th Cir. 2010) (citing Phillips v. Norris, 320 F.3d 844 (8th Cir. 2003)); see also Wilkinson v. Austin, 545 U.S. 209, 221 (2003) ("The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must

establish that one of these interests is at stake. A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' … or it may arise from an expectation or interest created by state laws or policies,") (citations omitted). "This analysis as to liberty parallels the accepted due process analysis as to property." Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974).  To show a deprivation of a protected liberty interest, the inmate "must identify conditions that impose 'atypical or significant hardship . . . in relation to the ordinary incidents of prison life.'"  Orr, 610 F.3d at 634 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).[11]  "In order to determine whether

---

[11]    In Orr, the prisoner argued that his due process rights were violated by disciplinary confinement because he was not given the opportunity to be heard concerning the alleged infraction, and that this failure constituted an "atypical and significant hardship" in relationship to the "ordinary incidents of prison life," as recognized by Sandin v. Conner, 515 U.S. 472, 484 (1995).  The Eighth Circuit rejected this contention, stating:

> The Supreme Court laid out the test for determining liberty interests in a prison setting in Sandin, 515 U.S. at 483-84, 115 S.Ct. 2293.
>
>> States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.
>
> Id. (citations omitted).
>
> In this context, there is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations. Rather, any liberty interest must be an interest in the nature of the prisoner's confinement, "not an interest in the procedures by which the

an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those he or she could expect to experience as an ordinary incident of prison life. . . ." Orr, 610 F.3d at 634 (quoting Phillips, 320 F.3d at 847) (internal quotations omitted). Once a deprivation of a protected interest is established, "the next question is what process is due." See Williams v. Norris, 277 Fed. Appx. 647, 648-49 (8th Cir. 2008) (citing Wilkinson, 545 U.S. at 224).

As such, to the extent that plaintiff is arguing that his right to due process was violated when he was placed in segregation, defendants' motion for summary judgment should be granted as to these claims. To prevail on a due process claim with respect to the imposition of segregation as a disciplinary measure, plaintiff had to make the threshold showing that the conditions he experienced in segregation imposed "atypical or significant hardship…in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. However, the Eighth Circuit "has consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship." Phillips, 320 F.3d at 847 (emphasis added); see also Portley-El v. Brill, 288 F.3d 1063,

---

state believes it can best determine how he should be confined." Id. Thus, Phillips is incorrect in asserting that the denial of a hearing should be considered when determining whether a liberty interest was affected. In order to determine whether an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those he or she could expect to experience as an ordinary incident of prison life. We do not consider the procedures used to confine the inmate in segregation. Kennedy, 100 F.3d at 643.

Id. at 847 (internal marks and citations omitted); see also Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (finding that a correctional facility's grievance procedure "does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.").

1065 (8th Cir. 2002) ("We have consistently held that administrative and disciplinary segregation are not atypical and significant hardships under <u>Sandin</u>."); <u>Freitas v. Ault</u>, 109 F.3d 1335, 1338 (8th Cir. 1997) (prisoner had no constitutionally protected liberty interest in remaining in less restrictive prison environment); <u>Kennedy v. Blankenship</u>, 100 F.3d 640, 642 n. 2, 643 (8th Cir. 1996) (punitive isolation is not an atypical and significant deprivation); <u>Roblero-Barrios v. Minnesota Dep't of Corrs.</u>, Civ. No. 11-2281, 2011 WL 5154254, at *7 (D. Minn. Sept. 21, 2011) ("assignment to [punitive] segregated confinement is considered to be a normal part of prison life."), Order Adopting Report and Recommendation, 2011 WL 5119563 (D. Minn. Oct. 28, 2011). "Thus, in order for [plaintiff] to assert a liberty interest, he must show some difference between his new conditions in segregation and the conditions in the general population which amounts to an atypical and significant hardship." <u>Phillips</u>, 320 F.3d at 847.

Plaintiff neither claimed nor offered any evidence to suggest that the conditions of his segregation were atypical or unduly harsh, much less how they were different from the general population. Instead, the thrust of plaintiff's due process claim was that being held in segregation for two years was too long.

It is true that plaintiff was found guilty for threatening others (penalized 120 days of segregation), disorderly conduct (penalized with 30 days of segregation), abuse and harassment (penalized with 30 days of segregation) and disobeying a direct order (penalized with 30 days of segregation), with regard to fraudulent UCC activities involving librarian Garbison. <u>See</u> Hudson Aff., Ex. 4 (Warden King's Appeal Decision for NOV 419158). This totals 210 days of segregation. However, the 90 days of segregation for disorderly conduct, abuse and harassment, and disobeying a direct

order ran concurrently (at the same time) to the 120 days of segregation for threatening others. The 120 days of segregation for these offenses does not constitute an atypical and significant hardship. See King v. Dingle, 702 F. Supp.2d 1049, 1075 (D. Minn. 2010) (concluding that a 6 month segregation sentence did not constitute a dramatic departure from prison life).

It is also true that plaintiff was found guilty of multiple separate violations that resulted in segregation sentences that ran consecutively to each other, resulting in approximately 630 days of segregation. See Hudson Aff., Ex. 4 (Warden King's Appeal Decision for NOVs 418801, 419151, 419158, 425821). But, plaintiff was not sentenced to all of this segregation time based on one violation. Instead, this time was imposed as a consequence of separate violations ranging in segregation time from 90 days to 270 days. Id. Viewing these incidents as separate incidents, the Court concludes that they do not constitute atypical and significant hardships sufficient to find a protected liberty interest. See Jordan v. Federal Bureau of Prisons, 191 Fed. Appx. 639, 652–53 (10th Cir. 2006) (five years in administrative detention was not an atypical or significant hardship in relation to the ordinary incidents of prison life); Rahman X v. Morgan, 300 F.3d 970, 973-74 (8th Cir. 2002) (twenty-six months of segregated confinement was not "atypical and significant hardship"); Griffin v. Vaughn, 112 F.3d 703, 708 (3rd Cir. 1997) ("we believe that exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed ... by a court of law," and thus prisoner's "commitment to and confinement in administrative custody did not deprive him of a liberty interest and ... he was not entitled to procedural due process protection") (internal citations omitted); Jones v. Baker,

155 F.3d 810, 812-13 (6th Cir. 1998) (two-and-a-half years in administrative segregation deemed not to be an atypical and significant hardship); Haggins v. MN Com'r of Corrections, Civil No. 10-1002 (DWF/LIB), 2012 WL 983590, at *8 (D. Minn. Feb. 14, 2012 ("Plaintiff was not sentenced to 19 months punitive segregation as the result of a single disciplinary violation. Instead, the record shows that Plaintiff has received a number of separate, smaller sentences ranging from 240 days to five days spent in disciplinary segregation. . . Each of these sentences can be viewed as separate punishments served in punitive segregation and do not constitute such a substantial departure from normal prison life.  Even Plaintiff's lengthiest sentence of 240 days cannot be said to constitute an atypical and significant hardship in relation to the ordinary incidents of prison life (citing Hemphill v. Delo, 124 F.3d 208 (8th Cir. 1997) (holding that more than 300 days in segregated confinement, by itself, was not sufficient to find a protected liberty interest)); Bunch v. Long, No. 06-4204-CV-C-NKL, 2008 WL 5082861 at *4 (W.D. Mo. Nov. 24, 2008) (twenty-two months in administrative segregation did not implicate the Due Process Clause); Wilson v. Harper, 949 F. Supp. 714, 723 (S.D. Iowa 1996) (11 months in segregation, including 6 months of punitive segregation did not trigger due process concerns); but see Williams v. Norris, 277 Fed. Appx. 647, 648-649 (8th Cir. 2008) (twelve years in segregation was an atypical and significant hardship due to the particular restrictions imposed in relation to the segregation); Herron v. Schriro, 11 Fed. Appx. 659, 661-662 (8th Cir. 2001) (a prisoner's "lengthy confinement, for more than thirteen years, in administrative segregation, resulted in an atypical and significant hardship in relation to the ordinary incidents of prison life").

Similarly, the loss of privileges, including not being allowed any telephone calls, only being allowed to shower three times a week and loss of prison employment (Pl.'s Mem., pp. 12, 13, 23, 25), is not an atypical and significant hardship in relation to the ordinary incidents of prison life. See Freitas, 109 F.3d at 1338 (concluding that the "loss of a higher-paying job and other privileges," did not constitute an atypical hardship that would support a due process claim); Deadmon v. Grannis, No. 06cv1382-LAB (WMC), 2008 WL 595883, at *6-7 (S.D. Cal. Feb. 29, 2008) (holding that allegations that an inmate confined in administrative segregation lost general population privileges, was restricted to family visits behind a closed window, and was allowed only one package a year, no phone calls, one shower every three days, and a maximum of ten hours per week of yard time did not amount to "an atypical and significant hardship in light of the ordinary incidents of his incarceration"); Castleberry v. Acker, No. 05-cv-74271, 2006 WL 250019, at *2 (E.D. Mich. Jan. 31, 2006) (loss of telephone privileges for twenty-four months is not an atypical and significant hardship); Dumas v. Garnett, No. 05-210, 2006 WL 149002, at *4 (S.D. Ill. Jan. 19, 2006) (inmates have no liberty interest in telephone privileges); Tarney v. Boles, 400 F. Supp.2d 1027, 1040 (E.D. Mich. 2005) (citations omitted) (concluding that an inmate's loss or restriction of telephone privileges for disciplinary reasons is not considered an atypical significant hardship, even when the disciplinary charges are allegedly false, and therefore does not implicate a liberty interest protected by due process); Troy v. Kuhlmann, No. 96 Civ. 7190(BSJ), 1999 WL 825622, at *12 (S.D.N.Y. Oct. 15, 1999) (citation omitted) (stating "denial of privileges such as telephone, package, and commissary privileges do not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant

hardship on the inmate"); see generally, Ware v. Morrison, 276 F.3d 385, 387 (8th Cir. 2002) ("loss of visitation privileges is within the ordinary incidents of confinement and cannot be considered an atypical and significant hardship"); Sealey v. Giltner, 197 F.3d 578, 581 (2d Cir. 1999) (finding no violation of the Eighth Amendment where "[a]n inmate [was] confined to his cell 23 hours per day, [could] take no more than three showers per week, ha[d] limited library privileges and no telephone privileges.").

In summary, the undisputed facts do not show that the discipline plaintiff received (in the form of segregation and loss of privileges) with respect to the various NOVs for which he was found guilty, amounted to an atypical and significant hardship. Therefore, plaintiff's claims do not implicate a liberty interest protected by due process. As such, defendants' motion for summary judgment should be granted as it relates to plaintiff's claims of deprivation of due process should be granted.[12]

_____

[12]     To the extent that plaintiff alleged he was denied procedural due process in connection with the hearings on the NOVs that lead to the imposition of extended incarceration, segregation or loss of privileges, the Court only examines the nature and scope of the disciplinary process after the inmate has established that he has been deprived of life, liberty or property. Here, because plaintiff failed to make out a protected liberty interest the Court need not address his procedural due process claim.

However, even if this Court had not determined that plaintiff's due process claims failed because he could not demonstrate that he was deprived of liberty as a consequence of the various the NOVs filed against him, the record does not support a claim that he was not afforded procedural due process through the various disciplinary hearings that lead the impositions of these penalties.

To satisfy the procedural due process requirements for prison discipline, plaintiff must show that he was entitled:

> (1) to advance written notice of the claimed violation at least 24 hours before the disciplinary hearing; (2) to call witnesses and to present documentary evidence in his defense if doing so will not jeopardize institutional safety or correctional goals; and (3) to receive a written

> statement from an impartial decisionmaker identifying the
> evidence relied on and the reasons for the disciplinary
> action.

Hrbek v. Nix, 12 F.3d 777, 780-81 (8th Cir. 1993) (citing Wolff, 418 U.S. at 563–67); see also Allen v. Reese, 52 Fed. Appx. 7, 8 (8th Cir. 2002) (unpublished opinion) (holding that federal prisoner's right to due process was satisfied where he was given (i) written notice of the charges against him, (ii) the right to call witnesses, and (ii) a written report of the DHO's decision), cert. denied, 540 U.S. 849 (2003)).

On the other hand, "[i]n the prison context, where swift and sure punishment is often imperative, the Constitution does not require trial-like evidentiary standards." Hrbek, 12 F.3d 777. In Wolff, the Supreme Court recognized that the prison environment necessitated granting prison officials discretion in setting evidentiary standards in disciplinary hearings:

> Ordinarily the right to present evidence is basic to a fair
> hearing; but the unrestricted right to call witnesses from the
> prison population carries obvious potential for disruption and
> for interference with the swift punishment that in individual
> cases may be essential to carrying out the correctional
> program of the institution…prison official must have the
> discretion to keep the hearing within reasonable limits and to
> refuse to call witnesses that may create a risk of reprisal or
> undermine authority, as well as to limit access to other
> inmates to collect statements or to compile other
> documentary evidence.

418 U.S. at 566. Consequently, neither confrontation nor cross-examination of witnesses are required to pass Constitutional muster. Id. at 567.

Due process also requires that there must be "some evidence" supporting the disciplinary determination. Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 454 (1985); see also Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) ("[w]hen inmates are entitled to due process before being disciplined, they must receive: (1) advance written notice of the charges; (2) an opportunity to present evidence in their defense; (3) a written statement by the fact finder of the reasons for the action; and (4) a decision supported by some evidence in the record").

The "some evidence standard" is satisfied if:

> there was some evidence from which the conclusion of the
> administrative tribunal could be deduced...." United States ex
> rel. Vajtauer v. Commissioner of Immigration, [273 U.S. 103,
> 106 (1927)]. Ascertaining whether this standard is satisfied

does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

<u>Hill</u>, 472 U.S. at 455-56 (emphasis added); <u>Goff v. Dailey</u>, 991 F.2d 1437, 1442 (8th Cir.) (due process is satisfied if disciplinary committee based its decision on "some evidence" in record), cert. denied, 510 U.S. 997 (1993).

Plaintiff's disciplinary records indicate that he received advance notice of the charges against him, was given an opportunity to present evidence, and the hearing officers' decisions were based on "some evidence."  <u>See</u> Hudson Aff., Exs. 3, 4.  In addition, it is also reasonable to assume that prison officials, like other officials, are presumed to be impartial decision makers, and an inmate's subjective beliefs, without more, that the officials acted improperly, are insufficient to survive summary judgment. <u>Cf.</u> <u>de Llano v. Berglund</u>, 282 F.3d 1031, 1035-36 (8th Cir. 2002) ("'We begin with a presumption that decision-makers are honest and impartial.  [The plaintiff] offers no evidence of vindictive behavior beyond his mere statement of belief that the Board members acted in this manner…[The plaintiff's] beliefs have no effect and do not create a genuine issue of material fact that would preclude summary judgment.'") (quoting <u>Marler v. Mo. State Bd. of Optometry</u>, 102 F.3d 1453, 1457 (8th Cir.1996) (bracketing in <u>de Llano</u>).

Furthermore, even accepting as true plaintiff's allegations that the hearing officers refused to call witnesses or obtain or present documentary evidence requested by him in connection with various NOVs (<u>see</u> Pl.'s Mem., p. 14), that decision was within the MNDOC officials' authority.  <u>See</u> <u>Wolff</u>, 418 U.S. at 566 (finding that prison officials do not need to explain why they had refused to allow an inmate to call witnesses or present evidence and only requiring the calling of an inmate's witnesses if doing so is not "unduly hazardous to institutional safety or correctional goals."); <u>see</u> <u>also</u> <u>Ponte v. Real</u>, 471 U.S. 491, 496 (1985) (holding that due process does not require that the reasons for refusing to call witnesses requested by an inmate at a disciplinary hearing be placed in writing.); <u>Hrbek</u>, 12 F.3d at 781 ("[D]isciplinary actions may be taken-and often they are-based only on a guard's report.  Even when there is substantial evidence to the contrary, the committee may find the guard's report to be credible and therefore take disciplinary action.") (citing <u>Hill</u>, 472 U.S. at 456) (constitutionally sufficient evidence consisted of guard's report and oral testimony)); <u>Whentworth v. Fisher</u>, Civ. No. 10-2270 (JNE/JSM), 2011 WL 5077612 at *9 (D. Minn. Oct. 7, 2011) ("In <u>Wolff</u> the Supreme Court recognized that the prison environment necessitated granting prison officials discretion in setting evidentiary standards in disciplinary hearings . . . prison officials must have the discretion to keep the hearing within reasonable limits and refuse to call witnesses that may create a risk of reprisal or undermine authority.'") (quoting <u>Wolff</u>, 481 U.S. at 566), Order Adopting Report and Recommendation, 2011 WL 5078870 (D. Minn. Oct. 26, 2011).

D.   **Access to the Courts**

Plaintiff has asserted that defendants unlawfully restricted his access to the courts.   The gist of this claim is that as consequence of MNDOC's policies and segregation practices, defendants unlawfully interfered with his litigation in this Court and state court, by restricting his access to his legal papers, supplies and services, interfering with his legal mail, and by wrongfully removing documents from his cell and footlockers.   In particular, plaintiff alleged that defendants' unlawfully interfered with his right to pursue the instant case, a separate habeas court suit previously brought in this Court, a post-conviction petition brought in state court and seven conciliation court actions brought in state court.   See, e.g., Third Amended Complaint, ¶¶ 41-48, 55-57, 66, 138-140, 153-157, 181-86, 187-191, 203-07, 227, 236-37, 241, 250-253, 255-57, 268, 271, 283, 290, 29, 300-23, 323, 349, 352-53, 357, 368, 372, 379-82, 390-95, 480-89, 490-500, 517-23, 606, 636-40, 647-58, 670-71, 676-82, 685, 693-71; Pl.'s Aff., ¶¶ 16, 23 28, 29, 67, 68, 74, 83, 84, 85-87, 95, 97; Pl'.s Mem., pp. 14-18.

In response, defendants maintained they are entitled to summary judgment on plaintiff's access to court claim because first, he cannot establish actual injury as required by the United States Supreme Court, (Defs.' Mem., pp. 29-32), and second, even if he could, enforcement of the MNDOC policies that may have hindered his access to the courts were reasonably related to legitimate penological interests.   Id.,

---

On this record, this Court does not find that the plaintiff was denied procedural due process.

pp. 33-37 (citing to <u>Turner v. Safley</u>, 482 U.S. 78 (1987)).[13]

_____

[13]     Under <u>Turner v. Safley</u>, 482 U.S. 78 (1987), prison rules which restrict a prisoner's constitutional rights are permitted if they are "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such objectives. 482 U.S. at 87.

> <u>Turner</u> sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. <u>Id.</u> at 89-90, 107 S.Ct. 2254. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. <u>Id.</u> at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have "a significant 'ripple effect' " on the guards, other inmates, and prison resources. <u>Id.</u> Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests." <u>Id.</u> at 90-91, 107 S.Ct. 2254.

<u>Murphy v. Missouri Dep't of Corr.</u>, 372 F.3d 979, 982-983 (8th Cir. 2004), <u>cert. denied</u>, 125 S.Ct. 501 (2004) (quoting <u>Turner</u>, 482 U.S. at 89-91); <u>see also Bonner v. Outlaw</u>, 552 F.3d 673, 678 (8th Cir. 2009) (citing <u>Turner</u> factors); <u>Semler v. Ludeman</u>, NO. CIV 09-0732 (ADM/SRN), 2010 WL 145275 at *9 (D. Minn. Jan. 08, 2010) ("<u>Turner</u> analysis applies equally to facial and as-applied constitutional challenges.") (citation omitted).

In reconciling the competing interests of an inmate's constitutional interests and a prison's regulations, "[w]e must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." <u>Id.</u>

The first consideration is whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.

> "[P]rison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate

Turning to the specifics of plaintiff's claims, defendants claimed that removal of excess property from his cell, denial of supplies, interference with a call to this Court on October 8, 2010, and transfer of plaintiff to administrative segregation in November 2010, did not amount to a denial of access to the courts regarding the instant

---

the relations between prisoners and the outside world."

Thornburgh v. Abbott, 490 U.S. 401, 408 (citing Procunier v. Martinez, 416 U.S. 396, 404-405 (1974)). "We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security."" Murphy, 372 F.2d at 983 (quoting Goff v Graves, 363 F.3d 543, 549 (8th Cir. 2004)). The first Turner factor requires the Court to "determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." Thornburgh, 490 U.S. at 414. In this regard, "[the Eighth Circuit has] recognized institutional security as "the most compelling governmental interest in a prison setting."" Goff, 362 F.3d at 549 (quoting Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir. 1996)); see also Overton, 539 U.S. at 133 ("The regulations promote internal security, perhaps the most legitimate of penological goals.").

As to the second factor – whether there are alternative means of exercising the right – "[a]lternatives . . . need not be ideal, however; they need only be available." Overton, 539 U.S. at 135.

The third factor is the impact an accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correction officials." Turner, 482 U.S. at 90; see Overton, 539 U.S. at 135 ("Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are 'particularly deferential' to prison administrators' regulatory judgments.") (citation omitted).

Finally, "Turner does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." Overton, 539 U.S. at 136.

suit as none of his claims were time-barred nor was he otherwise prejudiced in prosecuting this case.[14] See Defs.' Mem., pp. 30-31.

---

[14]     This Court notes that defendants argued that the legal injury suffered by plaintiff must relate to an action challenging his conviction or conditions of confinement. See Defs.' Mem., p. 29. This Court disagrees. It is true that under Supreme Court jurisprudence, a prison may not be obligated to affirmatively assist an inmate with the filing of a civil lawsuit unrelated to their incarceration. As the Supreme Court stated in Lewis:

> In other words, Bounds does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims. The tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

Lewis v. Casey, 518 U.S. 343, 355 (1996). However, that does not mean that a prison may erect barriers that prevent inmates from exercising their right to access to the courts in an unrelated civil matter, or that prisoners have no constitutionally protected right to litigate an unrelated civil matter without prison intervention. For example, after Lewis was decided, the Eighth Circuit determined that the following circumstances stated viable right-to-access-to-the-courts claims, yet the cases did not appear to involve challenges to the inmate's conviction, sentence or conditions of confinement: a policy that prevented an inmate from obtaining his legal papers from his jailhouse lawyer upon the latter's transfer, (Goff v. Nix, 113 F.3d 887, 892 (8th Cir. 1997)); the search, confiscation and reading of an inmate's legal mail and papers, (Cody v. Weber, 256 F.3d 764, 769 (8th Cir. 2001)); and a program that required inmates to use their idle-pay allowances for both personal hygiene items and postage and that lead to the dismissal of their cases because they did not have adequate funds to buy stamps to file a claim initially or to meet a deadline, (Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996). Moreover, this Court would be hard pressed to find that prisons can create obstacles to an inmate's civil suit in the face of the Prisoner Litigation Rights Act ("PLRA"), which explicitly permits prisoners to file civil actions in federal court unrelated to a prisoner's incarceration. See, e.g., Lefkowitz v. Citi-Equity Group, Inc., 146 F.3d 609, 612 (8th Cir. 1998) ("While several courts have noted that Congress promulgated the PLRA to curtail abusive prisoner litigation…we conclude that, under the plain language of the statute, the phrase "civil action or appeal" is not limited to challenges to conditions of confinement, and encompasses the instant commercial litigation.").

Second, defendants argued that while plaintiff alleged that MNDOC employees interfered with a habeas corpus proceeding before this Court, (<u>Duwenhoegger v. State of Minnesota</u>, Civil No. 09-02874 (PJS/JSM)), by delaying in making a copy of a fact chronology that he wanted to send to the Court, there was no prejudice to plaintiff because the Court gave him an extension to file documents, the Court received the chronology, and the Court ultimately found that his habeas petition was eight years too late. <u>Id.</u>, p. 31.

Third, defendants asserted that any interference with a state post-conviction proceeding in plaintiff's criminal case, which he alleged was denied for lack of service because of the confiscation of papers containing UCC references in September or October of 2010, was at odds with the record in federal and state court which showed that there was no post-conviction filing in plaintiff's state court case made after March 2010 much less dismissed. <u>Id.</u>, pp. 31-32 (citing <u>Duwenhoegger v. Minnesota</u>, Civil No. 09-2874 (D. Minn.), Docket No. 18 (Report and Recommendation)); Hudson Aff., Ex. 5 (Nicollet Count District Court Dockets for <u>State v. Jerry Duwenhoegger</u>, 52-K4-98-498 and <u>State v. Jerry Duwenhoegger</u>, 52-K5-98-462.).

Fourth, as for plaintiff's seven dismissed state conciliation court actions, defendants argued that four of them were dismissed without prejudice, and thus cannot provide a basis for his access to the courts claim. <u>Id.</u>, p. 32 (citing Hudson Aff. Ex. 9 (records from conciliation court actions <u>Jerry Duwenhoegger v. Natalie Leseman and Jana Wojcik</u>, 82-C0-11-856, <u>Jerry Duwenhoegger v. Mary McComb and Michael Green</u>, 82-C0-11-857, <u>Jerry Duwenhoegger v. Barb Nelson and Kathy Reid</u>, 82-C0-11-859, and <u>Jerry Duwenhoegger v. Natalie Leseman, Jana Wojcik, Mary McComb, and Michael</u>

Green, 82-C0-11-1190 filed by plaintiff in Washington County)). Regarding the other three conciliation court actions, which were dismissed with prejudice, defendants submitted they were not responsible for plaintiff's failure to file the necessary documents, the actions do not relate to his criminal conviction, and at any rate, plaintiff could not assert a § 1983 claim in conciliation court. Id., p. 32 (citing Hudson Aff, Exs. 6-9 (record of conciliation claims).

Plaintiff responded that the several-month delay in filing the present action was directly due to defendants' seizure and disposition of his legal filings and documents and the failure to return the documents to him. See Pl.'s Mem., p. 15. As for the dismissal of conciliation court cases, plaintiff contended that those cases dismissed with prejudice because defendants refused to file his tort claims, which do not require exhaustion of remedies under the Prison Litigation Reform Act of 1995. Id. In particular, plaintiff asserted that defendant Rudeen[15] refused to file and process a tort claim under Minn. Stat. § 3.736 based on unnamed defendants stealing money from him. See Pl.'s Aff., ¶¶ 85, 86.

Plaintiff also took issue with the state court's refusal to award him in forma pauperis ("IFP") status as to his conciliation court appeal, even though he had been granted IFP status as to the underlying conciliation appeal. See Pl.'s Mem., p. 15.

Finally, plaintiff asserted that he had filed an unidentified habeas corpus petition with the State of Minnesota, which was dismissed due to defendants holding and disposing his outgoing mail, and that he had filed a habeas corpus petition in 2012 that the Minnesota Supreme Court dismissed as untimely. Id., pp. 15-16.

---

[15] According to plaintiff, Lisa Rudeen is a Paralegal at MCF-STW. See Third Amended Complaint, ¶ 138.

In reply, defendants submitted that plaintiff's assertion that unnamed defendants delayed the filing of the present action does not establish that his claims were time-barred or that his case was otherwise prejudiced in a material manner. See Defs.' Reply. p. 8. Defendants also contended that plaintiff failed to explain how the seizing of his UCC-related paperwork as contraband injured his ability to bring a constitutional claim in court. Id. With regard to plaintiff's tort claim concerning defendants stealing money, defendants asserted that claim cannot give rise to a viable access to courts suit because it must be premised on a being precluded from bringing an action challenging his conviction or conditions of confinement. Id., p. 9. As for the May 2, 2012, "Writ of Habeas Corpus (MSA § 589)" filed in Washington District Court and challenging his underlying conviction, defendants maintained that it cannot be part of this case as the matter was filed after the operative Third Amended Complaint was filed, plaintiff cannot establish that his late filing to the Minnesota Supreme Court was due to any action by defendants, and in any case, any state writ of habeas corpus challenging his conviction is frivolous. Id., pp. 11-13.

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts," and the access must be "adequate, effective, and meaningful." Bounds v. Smith, 430 U.S. 817, 821-22 (1977); see also Lewis, 518 U.S. at 351 ("Insofar as the right vindicated by Bounds is concerned, "meaningful access to the courts is the touchstone,") (citation omitted).

Regardless of the source of an access-to-courts claim,[16] the prisoner must show actual injury.  See Lewis, 518 U.S. at 349 (in a case in which inmates alleged an a denial of access to the courts under the First, Sixth and Fourteenth Amendments, the Supreme Court stated the "requirement that an inmate alleging a violation of Bounds must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches") (citation omitted); Myers, 101 F.3d at 544 ("Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies

---

[16]    "Access to the courts is a constitutional right whose basis is unsettled." Earl v. Fabian, 556 F.3d 717, 726 (8th Cir. 2009) (citing Scheeler v. City of St. Cloud, Minn., 402 F.3d 826, 830 (8th Cir. 2005) (citing Christopher v. Harbury, 536 U.S. 403, 415 (2002)).  The right of access to the courts may be derived from the First Amendment; it may also be grounded in the Fourteenth Amendment Equal Protection and Due Process clauses.  See Scheeler, 402 F.3d at 830-31; Schrier v. Halford, 60 F.3d 1309, 1311 n.3 (8th Cir. 1995) ("Although "[t]he Court's opinion in Bounds is silent as to the source of [the right of access to the courts], . . . on other occasions the Supreme Court has said variously that it is founded in the Due Process Clause of the Fourteenth Amendment, . . . or the Equal Protection Clause, . . . or the First Amendment right to petition for a redress of grievances.") (citation omitted).  "[T]he right of meaningful access to the courts ensures that prison officials may not erect unreasonable barriers to prevent prisoners from pursuing or defending all types of legal matters." Id. at 1313.

> In Scheeler we concluded that a right to access the courts can be derived from the First Amendment. To prevail under the First Amendment a claimant typically bears the burden of proving that the defendants intentionally restricted his access to the courts. *** On the other hand, "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Boddie v. Connecticut, 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

Earl, 556 F.3d at 726-27.

prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.") (citation omitted); <u>Beck v. Pawlenty</u>, 2006 WL 2506993 at *5 (D. Minn. Aug. 29, 2006) ("For a violation of due process based on denial of access to the courts, a prisoner must show an actual injury. To do so, the prisoner is required to demonstrate that, as a result of the conduct of prison staff, the prisoner was denied the opportunity to prosecute a claim. It is insufficient to show that this conduct made litigation inconvenient. Instead the prisoner must show that this conduct actually prevented the prisoner from litigating the claim.") (citing <u>Cody</u>, 256 F.3d at 767-68; <u>Myers</u>, 101 F.3d at 544)).

Further, the "prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, <u>that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim</u>.'" <u>Hartsfield v. Nichols</u>, 511 F.3d 826, 832 (8th Cir. 2008) (emphasis added) (quoting <u>White v. Kautzky</u>, 494 F.3d 677, 680 (8th Cir. 2007) (citations omitted)); <u>see</u> <u>also</u> <u>Williams v. Hobbs</u>, 658 F.3d 842, 851-52 (8th Cir. 2011) (citations and marks omitted) ("Those in prison have a constitutional right of access to the courts. We have held that to state this claim, a prisoner must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.").

Finally, "there is 'no constitutional right of access to the courts to prosecute an action that is frivolous or malicious.'" <u>In re Tyler</u>, 839 F.2d 1290, 1292 (8th Cir. 1988)

(quoting <u>Phillips v. Carey</u>, 638 F.2d 207, 208 (10th Cir.), <u>cert.</u> <u>denied</u>, 450 U.S. 985 (1981)).

Plaintiff's denial of access to the courts claim fails because he cannot show actual injury.

### 1. The Instant Federal Action

Plaintiff has provided no evidence that he has been deprived of access to this Court in the instant case based on the limitations on the amounts or types of legal documents he can possess in his cell or in his footlockers; provision of only 50 pages of paper per week; denial of the ability to correct errors; holding of his legal mail for 10 days; refusal to send and receive his legal mail; theft and destruction of his filings; limitations on his access to the law library; or limitation on his ability to make photocopies.  <u>See</u> Pl.'s Aff., ¶¶ 16, 23 28, 29, 67, 68, 74, 83, 84, 85-87, 95, 97.

As an initial matter, the Court observes that the documents provided by plaintiff in support of these assertions refer to legal activities by plaintiff in September and October of 2012, and not the operative facts alleged in the April 2012 Third Amended Complaint. <u>See</u> Pl.'s Aff., Attachs. 2-6, 25-31A, 46-53.  Thus, these documents cannot serve as support for plaintiff's denial of access claims alleged in the Third Amended Complaint. But more significantly, even if they did bear on the allegations of the Third Amended Complaint (or are designed to show ongoing violations by some of the defendants), plaintiff can show no injury from this alleged conduct.  Since the inception of this case, plaintiff has filed with this Court correspondence and numerous and lengthy pleadings— indeed, the docket is replete with multiple motions for relief, with supporting materials and legal memoranda citing to statutory and case law in support of the motions.

Further, no action has been taken by the Court (for example, refusal to accept a pleading or other documents because it was not timely filed), which has deprived plaintiff of his opportunity to pursue his suit. Plaintiff can show no actual injury in his pursuit of the instant suit based on the alleged wrongful conduct of defendants.

## 2. Federal Habeas Petition

The Court also rejects any assertion by plaintiff that his delay in providing a chronology of his case to this Court in <u>Duwenhoegger v. State of Minnesota</u>, Civil No. 09-02874 (PJS/JSM), resulted in the denial of his habeas petition. The Court required plaintiff to supply a chronology of his case by November 13, 2009, in response to Court's inquiry as to why the case should not be dismissed for failing to comply with the one-year statute of limitations prescribed by 28 U.S.C. § 2244(d). <u>See Duwenhoegger v. State of Minnesota</u>, Civil No. 09-02874 (PJS/JSM), Docket No. 7. Plaintiff asked for additional time to respond to the Court's request and the Court allowed him to file his submissions until January 11, 2010. <u>Id.</u>, Docket Nos. 8, 12. Plaintiff's chronology of the case was filed with the Court on January 13, 2010, but nevertheless, even though it was late, it was considered by the Court in its Report and Recommendation, which was adopted by United States District Judge Patrick Schiltz. <u>Id.</u>, Docket Nos. 17-19. Ultimately, this Court found that plaintiff's habeas petition was untimely under 28 U.S.C. § 2244(d)(1)(A), because it was brought well over a year after his judgment of conviction became "final" on December 12, 2000. <u>Id.</u>, Docket No. 18 (Report and Recommendation), pp. 5-6, <u>aff'd</u> <u>by</u> Order dated April 5, 2010 [Docket No. 19]. In other words, it was because the underlying habeas petition was untimely by approximately nine years, and not because a MNDOC employee would not allow him to

submit a chronology to the Court in a timely manner, that plaintiff's federal habeas petition was dismissed. On this record, plaintiff can establish no actual injury from defendants' alleged conduct.

### 3.     State Post-Conviction Proceeding

Plaintiff alleged that in September 2010, defendant Venzer[17] seized post-conviction legal documents, which plaintiff asserted was directed to the Nicollet County District Attorney, Nicollet County Public Defender and Nicollet County Social Services. <u>See</u> Third Amended Complaint, ¶¶ 480-483, 491-495. Plaintiff claimed that Venzer wrote plaintiff up and defendant Rogosheske[18] presided over the disciplinary hearing bearing on this violation.[19] <u>Id.</u>, ¶¶ 479-488. According to plaintiff, at the hearing, Rogosheske read and seized these post-conviction documents, stating they were contraband because they referenced the UCC. <u>Id.</u>, ¶¶ 483, 488. As consequence, plaintiff's post-conviction petition was dismissed with prejudice. <u>Id.</u>, ¶ 486.

In his opposing memorandum and affidavit, plaintiff represented that he had filed a "Habeas Corpus" (not a post-conviction proceeding) in the Minnesota State courts and that it was dismissed due to defendants holding his outgoing legal mail until after the filing deadline had expired. Pl.'s Mem., p. 15; Pl.'s Aff., ¶ 84 (citing Attach. 46-53).

Plaintiff has not provided this Court with any evidence about a post-conviction proceeding (much less the subject of the post-conviction petition) or even evidence

---

[17]     According to plaintiff, Sheryl Venzer is a mailroom supervisor at MCF-STW. <u>See</u> Third Amended Complaint, ¶ 490.

[18]     According to plaintiff, Michael Rogosheske is a hearing officer for MNDOC's central office. <u>See</u> Third Amended Complaint, ¶ 479.

[19]     Neither plaintiff nor defendants provided any evidence of a NOV or disciplinary hearing bearing on this alleged violation.

about a disciplinary proceeding related to the confiscation of the legal papers bearing on this proceeding. Further, the attachments to plaintiff's affidavit make no mention of a post-conviction proceeding or even a state habeas petition for that matter. On the other hand, the undisputed evidence before this Court does establish that there was no post-conviction filing in plaintiff's state court case after March 2010 or one that was dismissed. See Duwenhoegger v. Minnesota, Civil No. 09-2874 (PJS/JSM), Docket No. 18 (D. Minn.) (Report and Recommendation), aff'd Order dated April 5, 2010 [Docket No. 19]; Hudson Aff., Ex. 5 (Nicollet Count District Court Dockets for State v. Jerry Duwenhoegger, 52-K4-98-498 and State v. Jerry Duwenhoegger, 52-K5-98-462).

Lacking any evidence to support plaintiff's claim that some unidentified post-conviction proceeding was dismissed, his access to courts claim with respect to this proceeding cannot go forward.[20]

---

[20] On May 2, 2012, plaintiff did file a "Writ of Habeas Corpus (MSA § 589)" in Washington District Court challenging his underlying conviction. See Second Affidavit of Kelly S. Kemp [Docket No. 195] ("Second Kemp Aff."), Exs. 3, 11. "A writ of habeas corpus is a statutory civil remedy available to obtain relief from unlawful imprisonment or restraint." State ex. rel. Marlowe, 755 N.W.2d 792, 794 (Minn. Ct. App. 2008) (citing Minn. Stat. § 589.01). "A writ of habeas corpus may also be used to raise claims involving fundamental constitutional rights and significant restraints on a defendant's liberty or to challenge the conditions of confinement." State ex rel. Guth v. Fabian, 716 N.W.2d 23, 26-27 (Minn. Ct. App. 2006), rev. denied (Minn. Aug. 15, 2006). A writ of habeas corpus is not available to "persons committed or detained by virtue of the final judgment of a competent tribunal of civil or criminal jurisdiction." Minn. Stat. § 589.01; see also Harrison v. Fabian, No. 10-4335 (JRT/SRN), 2010 WL 5692087, at *2 (D. Minn. Dec. 15, 2010) ("Under this statute, a person who claims to be wrongfully detained by Minnesota state authorities, (but who is not directly challenging a criminal conviction or sentence), can bring a habeas corpus action in state court."). In summary, where a state habeas petition under Minn. Stat. § 589.01 cannot be used to challenge an underlying conviction, even if plaintiff allegations are true that it was defendants' actions that caused the dismissal of his state habeas petition, his right to access the courts was not violated because the petition was frivolous.

### 4.    Conciliation Court Cases

As for plaintiff's claim that his conciliation cases were dismissed with prejudice because defendants refused to file his "Tort Claim" under Minn. Stat. § 3.736, even if this allegation is true, any conciliation claim based on such a claim is frivolous.  Thus, plaintiff cannot show an actual injury to support a denial of the right of access to the courts to prosecute such an action.

Section Minn. Stat. § 3.736 provides in relevant part:

> The state will pay compensation for injury to or loss of property or personal injury or death caused by an act or omission of an employee of the state while acting within the scope of office or employment or a peace officer who is not acting on behalf of a private employer and who is acting in good faith under section 629.40, subdivision 4, under circumstances where the state, if a private person, would be liable to the claimant, whether arising out of a governmental or proprietary function. Nothing in this section waives the defense of judicial, quasi-judicial, or legislative immunity except to the extent provided in subdivision 8.
>
> * * *
>
> Subd. 3. Exclusions. Without intent to preclude the courts from finding additional cases where the state and its employees should not, in equity and good conscience, pay compensation for personal injuries or property losses, the legislature <u>declares that the state and its employees are not liable for the following losses</u>:
>
> * * *
>
> (m) <u>loss, damage, or destruction of property of a patient or inmate of a state institution</u>;. . . .

Minn. Stat. § 3.736, subds. 1, 3(m) (emphasis added).

Where, as here, plaintiff is an inmate of a state institution, he cannot bring a suit under Minn. Stat. § 3.736 for any money he claims was taken from him by defendants,

and therefore, a denial of access to the courts cannot be premised on such a frivolous action.

For all of these reasons, this Court recommends summary judgment be granted as it relates to plaintiffs' access to the courts claims because plaintiff has not demonstrated through evidence (as opposed to unsupported argument) that defendants' actions or policies resulted in actual harm or injury to him.[21]

---

[21]    In addition to attacking plaintiff's access to courts claim on grounds that he could not make out an actual injury, defendants also argued that to the extent that MNDOC's policies and their actions based on these policies may have limited plaintiff's access to the courts, there are legitimate penological interests that justify those policies and actions. See Defs.' Mem., pp. 33-37 (citing and addressing each of the Turner factors), Defs.' Reply, pp. 13-15 (same). This Court does not need to reach this argument because it has concluded that plaintiff's access to courts claim fails for lack of proof of an actionable injury. Suffice it to say, however, in its Report and Recommendation denying plaintiff's request for a TRO and a protective order, this Court addressed the Turner factors at length in determining the reasonableness of defendants' actions and policies bearing the amount of legal materials, supplies, papers and envelopes an inmate in disciplinary segregation may possess. See Report and Recommendation [Docket No. 121], aff'd by July 18, 2012 Order [Docket No. 159].

As for MNDOC's prohibitions on the possession of documents and materials related to fraudulent liens and UCC activities, the Court finds that MNDOC's Division Directive 301.030, which prohibits inmates from possessing "[a]ny information related to filing false or fraudulent Uniform Commercial Code (UCC) liens, including bank or completed UCC forms, materials related to copyrighting one's own name, materials describing or advocating filing UCC liens against government employees (see also Division Directive 302.020 "Mail"). . . . (Third McComb Aff.,Ex. 19, p. 2), and defendants' conduct in enforcing this Directive, are "reasonably related to legitimate penological interests" and are not an "exaggerated response" to such objectives. Turner, 482 U.S. at 87.

First, Associate Warden McComb explanation of the genesis and rationale behind the prohibition on UCC-related materials, (McComb Third Aff., ¶¶ 93-103, 105, 107-109, 113) provides a valid and rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. Turner, 482 U.S. at 89. Correctional facilities have a legitimate interest in deterring crime occurring in prison, promoting internal security and protecting the outside public. See Pell v. Procunier, 417 U.S. 817, 823 (1974) (discussing legitimate interests of correctional facilities, including deterring crime, quarantining criminal offenders for protective and

rehabilitative purposes, and internal security); Berdella v. Delo, 972 F.2d 204, 209 (8th Cir. 1992) (corrections facilities have a "legitimate interest in protecting the public from harassment."). "The abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented." Hudson v. Michigan Dept. of Corrections, No. 2:08-cv-208, 2009 WL 56759 at *7 (W.D. Mich. Jan. 08, 2009) (collecting cases); Monroe v. Beard, 536 F.3d 198, 208 (3rd Cir. 2008), cert. denied, 129 S.Ct. 1647 (2009) ("in light of the DOC's experience with the inmate's June 2005 filing, which demonstrated that fraudulent UCC filings are easy to file but burdensome to remove, along with the research that informed their judgment on this policy, we conclude that the defendants' decision to engage in preemptive action in this case was reasonable and within their broad discretion. Accordingly, we agree with the District Court that, under the Turner threshold inquiry, the defendants have shown that the DOC policy and the August 2005 confiscation of plaintiffs' materials were reasonably related to their interest in protecting government officials from fraudulent liens.") (citations and marks omitted). Defendants have amply demonstrated that MNDOC's contraband policy and the confiscation of plaintiff's UCC-related materials pursuant to this policy were rationally related to inmate rehabilitation and MNDOC's interest in protecting the public from fraudulent liens.

Second, there are alternative means of exercising the right of utilizing UCC materials for legitimate purposes in the form of requesting permission from a case manager to use such materials. See Third McComb Aff., ¶¶ 103, 112, Ex. 46.

Third, as to the third Turner factor – the effect on MDOC staff and other inmates – it is clear that accommodating plaintiff to allow him and other inmates to possess unapproved UCC materials will have the deleterious effect of encouraging them to intimidate staff and inmates with the filing of liens. See Third McComb Aff., ¶ 113; Monroe, 536 F.3d at 209 ("Under the third Turner factor, we consider the impact of accommodating the plaintiffs' asserted right to possess the contraband on guards, other inmates, and the allocation of prisoner resources generally. Defendants argue, and we agree, that accommodating the plaintiffs' right to possess these materials may encourage them to harass, intimidate or threaten prison officials, including guards and administrators, by threatening to file liens.") (citation omitted).

Finally, ready alternatives at a de minimis cost for accommodating plaintiff's interest in possessing UCC materials are not available. Plaintiff has not suggested to the Court any other alternatives that would be feasible. Simply waiting until plaintiff files a UCC lien to start confiscating such materials is not feasible. Monroe, 536 F.3d at 209 ("In light of the considerable time and expense imposed by these UCC, redemption, and name "copyrighting" schemes, we agree that requiring the DOC to accommodate plaintiffs right by adopting a "wait and see" approach, rather than by the pre-emptive measures they employed in this case, would impose more than a 'de minimis' cost to prison officials.") (citation omitted).

E.    **Right to Grieve**

Defendants argued that plaintiff's claims alleging that they interfered with his ability to grieve issues relating to his incarceration should be dismissed for the following reasons:

> Plaintiff appears to allege that DOC employees interfered with his ability to grieve issues. This claim appears to be related to his access to the courts claim and as with those other claims he has failed to demonstrate prejudice. But to the extent that his allegations could be interpreted as some kind of separate cause of action, they do not state a claim.
>
> Prison grievance procedures provide procedural rights but confer no substantive rights. Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993). The PLRA does not prescribe the form of administrative remedies. The PLRA represents only a procedural hurdle an inmate must overcome before commencing a lawsuit.

Defs.' Mem., p. 38.

Plaintiff responded that he "has filed grievances & cited factual violations by defendants, proven prejudice, malice aforethought, harm and injury.  These facts are stated in the grievances themselves."  Pl.'s Mem., p. 18.

Contrary to defendants' assertion, the "filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity." Lewis v. Jacks, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994)).  On the other hand, plaintiff has not cited to any grievances in support of his argument or explained why defendants' conduct as it relates to his grievances was improper.  As one court in this district has stated:

> This Court does not function as a research assistant for the parties. If Binion is serious about her negligence claim, then it is her responsibility to brief it—and, in particular, to cite evidence in the record supporting it. See Celotex Corp. v.

> <u>Catrett</u>, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265
> (1986) (where the nonmoving party will bear the burden of
> proof at trial, it must point to facts showing that there is a
> genuine issue for trial in response to a motion for summary
> judgment); <u>United States v. Dunkel</u>, 927 F.2d 955, 956 (7th
> Cir.1991) ("Judges are not like pigs, hunting for truffles
> buried in [the record]."). As she has failed to do so, the Court
> grants defendants' motion for summary judgment on Binion's
> negligence claim.

<u>Binion v. City of St. Paul</u>, 788 F. Supp.2d 935, 950 (D. Minn. 2011).

In short, it is not this Court's role to scour the record and divine arguments and their supporting evidence on behalf of the parties. For all of these reasons, defendants' motion for summary judgment claim should be granted as it relates to plaintiff's right to grieve claims.[22]

### F.      Freedom of Religion Violations

Plaintiff alleged that defendants violated his right to freedom of religion under First Amendment by seizing mail and documents with the title of "Pastor" associated with his name, punishing him for using the title of "Pastor" and seizing Bible correspondence course materials.

Defendants argued that MNDOC policy prohibiting plaintiff from using the title of "Pastor" on the envelopes that he sent out or that were sent to him via mail does not substantially burden his ability to exercise his religion because he has not alleged that

---

[22]      The best this Court could discern from plaintiff's Affidavit is that defendants did not allow him to properly grieve the money that he claims was taken from him by defendants. <u>See</u> Pl.'s Aff., ¶¶ 90, 93, 94, 95, 96. In support, plaintiff cited to kites and responses to the kites by defendants. <u>Id.</u>, Attachs. 71, 72, 73, 74, 74A, 75, 76, 77A, 78. Plaintiff then asserted that defendants would not consider a document submitted by him as to the grievance, but he did not attach the document or provide the Court with any information on how this document would have helped him with his grievance. Regardless, is apparent from the kites and responses to the kites that these events occurred in July and August of 2012, and are outside the timeframe covered by the April 2012 Third Amended Complaint.

his religion requires him to use the title.  <u>See</u> Defs.' Mem., p. 39.  Additionally, defendants submitted that his free exercise claim fails because he cannot show how prohibiting him from using the title "Pastor" prevents him from practicing his religion.  <u>Id.</u>

The use of a ministerial title is considered practicing a profession in violation of Offender Discipline Rule 190 and is in violation of by MNDOC Policy 202.055.  Offender Discipline Rule 190 provides: "No offender shall engage in a business activity or enterprise nor use a facility address as a business address."  <u>See</u> Third McComb Aff., ¶ 42, Ex. 16. MNDOC Policy 202.055 states: "[n]o offender or group of offenders will be allowed to have control or authority over other offenders."  <u>Id.</u>, ¶ 42, Ex. 5.  In addition, MNDOC policy also prohibits an offender from using a business name or position title when sending and receiving mail.  <u>Id.</u>, Ex. 7 (MNDOC Policy 302.020-incoming and outgoing mail policy).  In this regard, the Definitions section of this mail policy provides that someone who is sending mail to an offender must address the envelope with only the offender's MNDOC-recognized legal name and offender identification number, along with the address of the facility where the offender is incarcerated.  <u>Id</u>

According to Associate Warden McComb, inmates are not allowed to practice a profession or use a professional title while incarcerated, including doctors and lawyers, because permitting an inmate to use a professional title such as "pastor" or "doctor" would confer a special status on them that would interfere with inmate-to-inmate interactions and staff-to-inmate interactions.  <u>Id.</u>, ¶ 42.  In addition, offenders are prohibited from using the facility as any form of a business or professional address or from using a position or professional title so as to mislead persons who communicate with an offender by mail.  <u>See</u> Second Affidavit of Mary McComb [Docket No. 99],

¶ 15.[23]

Defendants also asserted that plaintiff failed to demonstrate that his inability to take a correspondence bible class while in segregation substantially burdened his ability to exercise his religion, given that he was allowed to possess in his cell a religious text, a religious object and published religious materials from the facility's religious coordinator.  Id., pp. 39-40.

Plaintiff responded that defendants precluded him from taking an online correspondence bible course while in segregation.  See Pl.'s Mem., p. 20.  Plaintiff also argued that defendants had accepted his use of the title of "Pastor" for years, but once he filed the present action, he was precluded from using the title.  Id., pp. 20-21; Pl's Aff., ¶ 35.  According to plaintiff, the use of the term "Pastor" does not imply any prison leadership and the use of this term and participation in a correspondence bible study group are central tenets of his faith.  Id., p. 20.  Plaintiff maintained that a prisoner may adopt a religious name where, as here, he has a minister's license (which he placed in his prisoner's file), and that his religion precludes him from going to court to have his name legally changed.  Id., p. 21.

Defendants replied that nothing in plaintiff's Affidavit asserts that his ability to practice his religion was substantially burdened.  See Defs.' Reply, p. 16.  All that plaintiff is precluded from doing is using a title in correspondence that would allow him represent himself as a leader within the prison or could mislead persons in the external community.  Id.  As for the bible correspondence course, any educational programming is precluded in segregation, in the same manner that other privileges are withheld.  Id.

_____

[23]     The Second Affidavit of Mary McComb was submitted by defendants in opposition to plaintiff's motion for a protective Order [Docket No. 88].

Further, defendants claimed that plaintiff had alternative means to practice his religion while he was in segregation. Id., p. 17.

"[P]risoners retain the right to the free exercise of religion." Salaam v. Lockhart, 905 F.2d 1168, 1170 (8th Cir. 1990). In order to state a viable claim of denial of the free exercise of religion, a prisoner must allege and prove that the action at issue unreasonably impinged on the inmate's exercise of his religion, and that such impingement was not reasonably related to legitimate penological interests. See Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997). "As an initial matter, a person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief." United States v. Ali, 682 F.3d 705, 709 (8th Cir. 2012) (citing Weir, 114 F.3d at 820). "A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so." Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 983 (8th Cir. 2004), cert. denied 543 U.S. 991 (2004). The Eighth Circuit has held that "that to demonstrate a substantial burden on the exercise of religion, a government policy or action 'must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.'" Van Wyhe v. Reisch, 581 F.3d 639, 656 (8th Cir. 2009) (quoting Patel v. U.S. Bureau of Prisons, 515 F.3d 807, 813 & n. 7 (8th Cir. 2008), quoting Murphy, 372 F.3d at 988).

### 1.    Use of the Honorific Title of "Pastor"

The Eighth Circuit has concluded that when inmates legally change their names as a result of their faith, the adoption of these religious names by inmates "practicing that religion is generally recognized as an exercise of both first amendment speech and religious freedom." Salaam, 905 F.2d at 1169-70 n. 4 (citations omitted).  However, "[u]nder the First Amendment, a prison is not obligated to accept [a prisoner's] new name, until he has legally changed it, even if he adopted it for sincere religious reasons." Shidler v. Moore, 446 F. Supp.2d 942, 948 (N.D. Ind. 2006) (citing Azeez v. Fairman, 795 F.2d 1296 (7th Cir. 1986)).  Given that plaintiff has not legally changed his name to "Pastor Jerry Duwenhoegger, Sr.," the fact that defendants have prevented him from sending out mail or receiving mail with the honorific title "Pastor" does not substantially burden his exercise of his religion.

Additionally, the Court finds that based on the Turner factors, that the limitations on plaintiff's use of the title of "Pastor" were reasonably related to legitimate penological interests.

First, the Court finds that restricting plaintiff from sending and receiving mail with the title of "Pastor" is rationally related to the legitimate interests of facility security and public safety.  Courts have recognized a prison's policy interest in prohibiting the creation of leadership roles within a religion, in order to maintain prison security and discipline. See Shabazz v. Arkansas Dept. of Corr., 157 Fed. Appx. 944, 945-46 (8th Cir. 2005) (citations omitted).  Allowing plaintiff to receive and send out mail with the title "Pastor" may cause other inmates to treat him as religious leader and thus upset the balance between inmate relationships.  While plaintiff asserts that that term "Pastor"

does not reflect religious leadership (see Pl.'s Aff., ¶ 31) and that he has never held himself out as a religious leader, the word "pastor" is defined as "a spiritual overseer; especially: a clergyman serving a local church or parish."  Merriam-Webster Online http://www.merriam-webster.com/dictionary/pastor.  Thus, even if plaintiff believes that the term does not signify religious leadership (which seems in doubt given that he has seen it fit to allegedly obtain a minister's license), his belief is irrelevant.  The question is whether the inmates and the public at large are likely to believe that the honorific title of "Pastor" refers to a spiritual leader.  Further, the policy is rationally related to preventing the outside public from being taken advantage of merely because an inmate is or claims to be a pastor.

Second, there are alternative means for plaintiff to exercise his religious beliefs —he can continue to profess his faith in the substance of his mailings.

Third, as to the effect on MDOC staff and other inmates, as stated previously, accommodating plaintiff and allowing him to use the honorific title of "Pastor" may lead to the belief by other inmates that plaintiff is a religious leader and consequently, interfere with inmate-to-inmate interactions.  Finally, ready alternatives for accommodating plaintiff's interest in using the title of "Pastor" are not available.

For all of these reasons, the Court finds that prohibiting plaintiff from using the title "Pastor" in mail sent and received by him does not violate his First Amendment right to religion and summary judgment on this claim should be granted.

### 2. Correspondence Bible Class

There is no dispute that plaintiff was denied participation in a correspondence Bible studies course while he was in segregation.  See Third McComb Aff., ¶ 91, Ex. 41;

see also Pl.'s Ex. 38A. Further, there is no dispute that the reason he was denied access to the course was because MNDOC Policy 204.042 prohibits offenders in segregation from being allowed course materials or testing while in segregation. See Third McComb Aff., ¶ 91, Ex. 41. In addition, there is not dispute that Deputy Commissioner Carlson denied plaintiff's appeal, stating that plaintiff could request and receive religious study materials concerning the Bible from the facility's religious coordinator, he could continue to correspond with persons of his choosing in the community to share fellowship and discuss his faith and Bible issues, and he could read and pray the Bible in his cell. Id. The only activity that plaintiff was precluded from pursuing while in segregation was participation in outside correspondence courses. Id.

Plaintiff asserted that defendants did not and cannot provide an alternative to correspondence Bible studies, as it is the study of the Bible and the study of it with others that is the mandate of his faith. See Pl.'s Aff., ¶ 33.

The Court has before it no evidence of the contents of the correspondence Bible course plaintiff sought to take or how the correspondence process worked. All that the Court knows is that it involved the study of the Bible and corresponding with others regarding the Bible. On the other hand, the undisputed evidence before the Court is that plaintiff was explicitly allowed to request and receive religious study materials concerning the Bible from the facility's religious coordinator, he was permitted to continue to correspond with persons of his choosing in the community to share fellowship and to discuss his faith and Bible issues, and he could read and pray the Bible in his cell. Given that plaintiff was allowed to read his Bible, was allowed to receive Bible study materials, and was allowed to correspond with others regarding the

Bible, the Court concludes that plaintiff's practice his religion was not substantially burdened via the denial of the correspondence course.

On this basis, the Court finds that prohibiting plaintiff from engaging in a Bible study correspondence course does not violate his First Amendment right to religion and summary judgment on this claim should be granted.

For all of the reasons stated above, the Court finds that defendants' motion for summary judgment as it relates to plaintiff's freedom of religion claims should be granted.

### G.     Freedom of Speech Claims

Defendants contended that any free speech violation alleged by plaintiff based on not being allowed communicate with others using the title of "Pastor," being prohibited from sending or receiving sexually explicit material, or being prevented from communicating or using UCC-related materials should be dismissed as defendants' policies and actions were reasonably related to legitimate penological interests under Turner.  See Defs.' Mem., pp. 40-41.

Similar to previous arguments relating to his access to the courts and freedom of religion claims, plaintiff argued that defendants' refusal to allow him to use UCC-related materials and to use the honorific title of "Pastor" violated his right to free speech.  See Pl.'s Mem., p. 21.  With regard to the issue of receiving or sending sexually explicit materials, plaintiff asserted that he wrote a love story in a letter and sent it to another offender who had asked for a sample of his writing and storytelling.  Plaintiff claimed that defendants' seizure of this romance story was unlawful.  Id.  Plaintiff also claimed that he had no ability to send mail to his family and friends because he only was

provided three indigent envelopes allowing for only 13 ounces of mail per envelope, and MNDOC staff seized any extras he had in his room. Id., p. 19.

To the extent that plaintiff is asserting that defendants' policy of precluding him from possessing or sending out UCC-related materials or precluding him from using the title of "Pastor" in his mailings restricts his right to free-speech, the Court finds that summary judgment in favor of defendants is appropriate on these claims, as the Court has already found that defendants' actions were reasonably related to legitimate penological interests under Turner. See Report and Recommendation, Sections III.D.4 and III.F.1, supra. As for plaintiff's claims that limiting his supplies (i.e., envelopes) and the confiscation of his love story, the Court addresses each of them below.

### 1. Limit on Supplies

With regard to restrictions on supplies and envelopes, defendants indicated that an indigent inmate with less than $1 in his account receives each week three envelopes (one large postage-paid envelope and two postage-paid business sized envelopes), 35 sheets of writing paper, 35 photocopies and a pen, and may request larger or additional supplies and envelopes if they are needed for litigation. Third McComb Aff., ¶¶ 12-14, Ex. 6 (MNDOC Policy 300.140).[24] The purpose for placing limits on supplies and envelopes is to encourage inmates to work (work includes treatment and education assignments), for which they get paid, and self-sufficiency – objectives which are tied to

_____

[24] Such a request for additional materials must be submitted via an Indigent Offender Supply Request form and identify the purpose for which the supplies will be used, the Court case and number, the deadline for submission, including in some instances documentation of the deadline, and if additional envelopes are requested, the address to which the envelopes will be sent. If the request for additional envelopes is granted, MNDOC staff will address the envelope for the inmate based on the information provided by the inmate on the form to ensure that the envelopes are used for legal purposes and not some other purpose. See Third McComb Aff., ¶ 14.

the MNDOC's goal of rehabilitation.  Id., ¶¶ 15, 16.  Offenders who find themselves in segregation due to misconduct, are not paid and are in large part indigent.  Providing unlimited envelopes and supplies to plaintiff while in segregation would diminish the consequences for his misconduct.  Id., ¶ 17.  In addition, restricting access to free supplies saves MNDOC's limited resources by saving money and staff time, which in turn benefits the public.  Id., ¶ 18.  Further, limiting free supplies fosters rehabilitation by encouraging inmates to comply with rules so that they can earn money and purchase the supplies they need.  See Third McComb Aff., ¶ 13.  Inmate rehabilitation is a legitimate penological interest.  See Dawson v. Scurr, 986 F.2d 257, 260 (8th Cir. 1993).

This Court finds that limiting supplies, papers and envelopes to an inmate in disciplinary segregation is rationally related to inmate rehabilitation.  If an inmate in segregation can receive unlimited supplies, this would eliminate one of the inducements designed to encourage him to follow prison regulations and to conduct himself appropriately, and would interfere with the incentive to earn the right to engage in work or an educational program to secure money for supplies.

Second, to the extent that plaintiff is torn between using his envelopes for legal or personal mail, the Court finds that there are alternative means available to plaintiff to obtain additional adequate legal supplies, including papers, envelopes and copying, to allow him to exercise his right to access the courts, while at the same time communicating via mail with family in friends.

Third, there are no other readily available alternatives other than giving plaintiff all the supplies he wants, which would inevitably run afoul the amount of property he

can keep in his cell.  And finally, plaintiff has not provided the Court with other alternatives that fully accommodates the prisoner at de minimis cost.

Based on examination of the <u>Turner</u> factors, this Court concludes that the limitations on supplies are reasonably related to legitimate penological interests.

### 2. Love Story

MNDOC Policy 301.030 prohibits sexually explicit materials.  <u>See</u> Third McComb Aff, ¶ 25, Ex. 19.  There is no dispute that sexually explicit material poses a security risk because it contributes to inmate bartering and assaults, interferes with sex offender rehabilitation, and facilitates a hostile work environment for staff.  <u>See</u> <u>Smith v. Fabian</u>, Civ. No. 10-2193 (JRT/TNL), 2012 WL 1004982 at *5-6 (D. Minn. March 26, 2012) (citations omitted); <u>see</u> <u>also</u> Third McComb Aff, ¶¶ 27-29.  Whether plaintiff's love story violated MNDOC Policy 301.030 is unknown, as plaintiff did not give the Court with any evidence or description of its contents so as to allow the Court to evaluate whether it did indeed constitute sexually explicit materials.  Based on plaintiff's failure to provide or point the Court to any evidence to support his claim that defendants' actions were improper, the Court finds that defendants' motion for summary judgment as to this claim should be granted.

### H. <u>Equal Protection Claims</u>

Plaintiff alleged that defendants generally treated him worse than other inmates and specifically asserted that Muslims are allowed to use religious titles in their names, but he, as a Christian is not allowed to use the title of Pastor.  <u>See</u>, <u>e.g.</u>, Third Amended Complaint, ¶¶ 127, 260, 384.  Defendants argued that plaintiff's equal protection claims must fail because all inmates are subject to the same policies, plaintiff has not been

singled out or treated differently based on any protected status, and he has not established any intentional discrimination.  <u>See</u> Defs.' Mem., p. 44.  Specifically, defendants contended that while plaintiff alleged that Muslims are allowed used to use a suffix with their name and he cannot use the title of "Pastor," he did not allege or demonstrate that Muslims who use the suffix do so in order hold themselves out as religious leader, or that if there was such an individual, he cannot prove that difference in treatment was the result of discrimination by defendants.  <u>Id.</u>, p. 45.

Plaintiff's response was "plaintiff never presented himself as a leader in the prison & had protected status to declare his Nationality & exercise his protected Constitutional, civil & human rights."  <u>See</u> Pl.s' Mem., p. 23.

The Equal Protection Clause of the Fourteenth Amendment forbids a state from denying "any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, §1.  "The Fourteenth Amendment requires that the government 'treat similarly situated people alike,' a protection that applies to prison inmates."  <u>Murphy v. Missouri Dept. of Corrs.</u>, 372 F.3d 979, 984 (8th Cir. 2004) (citing <u>Rouse v. Benson</u>, 193 F.3d 936, 942 (8th Cir. 1999)).  In order to succeed on an equal protection claim, a claimant must prove that he has been treated differently from other similarly situated individuals, either by operation of a state law or regulation, or by a decision by a state official.  <u>See</u> <u>Bogren v. Minnesota</u>, 236 F.3d 399, 408 (8th Cir. 2000) ("In general, the Equal Protection Clause requires that state actors treat similarly situated people alike"), <u>cert</u> <u>denied</u>, 534 U.S. 816 (2001) (citing <u>Klinger v. Dep't. of Corrs.</u>, 31 F.3d 727, 731 (8th Cir. 1994), <u>cert</u>. <u>denied</u>, 513 U.S. 1185 (1995)).

It is not enough, however, for an equal protection claimant to show that he has been treated differently from others who are similarly situated; he must also show that there is no rational basis for the dissimilar treatment he received. Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916, 921 (8th Cir. 2001) ("[a] plaintiff may bring an equal protection claim... where she alleges 'that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment'") (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); see also Phillips, 320 F.3d at 848 ("Because Phillips does not allege he was a member of a protected class or that a fundamental right was violated, he must show that 'similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest.'") (quoting Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)); Hosna v. Groose, 80 F.3d 298, 304 (8th Cir. 1996) ("[t]o prevail in their claims, the Inmates must prove that '(1) persons who are similarly situated are treated differently by the government, and (2) [that] the government [has failed] to provide a rational basis for the dissimilar treatment'"), cert. denied, 519 U.S. 860 (1996), quoting Moreland v. United States, 968 F.2d 655, 660 (8th Cir.) (en banc), cert. denied, 506 U.S. 1028 (1992).

Finally, the claimant must show intentional or purposeful discrimination. See Klinger v. Dep't of Corr., 31 F.3d 727, 733 (8th Cir.1994). Thus, to prevail on an Equal Protection claim, a plaintiff must show that the challenged action "had a discriminatory effect and was motivated by a discriminatory purpose." United States v. Armstrong, 517 U.S. 456, 465 (1996).

Plaintiff has made none of the necessary showings required to succeed on an equal protection claim in his opposition, as he only argued that he never presented himself as a leader in the prison.  Defendants' motion for summary judgment should be granted.[25]

## I.        Procedural and Substantive Due Process Claims

Plaintiff claimed in his Third Amended Complaint that he was deprived of "due process" in relation to seizure of his mail by staff, and the loss of his prison employment resulting from the false allegation that he took a 5-pound block of cheese.

As a preliminary matter, defendants observed that while plaintiff alleged various due process violations, he never clarified whether he was asserting a denial of procedural or substantive due process.  See Defs.' Mem., p. 45.  Not knowing what plaintiff was claiming, defendants explained that "[p]rocedural due process addresses the procedures necessary before depriving an individual or a protected liberty or property interest", whereas "[s]ubstantive due process applies to government interference with a fundamental right and executive actions that shock the conscience." Id., (citations omitted).  With respect to the loss of his prison job because he accepted food from a kitchen worker or as a consequence of being disciplined, defendants maintained that plaintiff does not have a procedural due process right to prison

---

[25]        The Court notes that plaintiff alleged in his Third Amended Complaint that Muslims are allowed by MNDOC policy to use their religious titles.  See Third Amended Complaint, ¶¶ 127, 384.  MNDOC's mail policy, Policy 302.020, prohibits the use if position title in addresses, but does allow the religious suffixes of "-El" or "-Bey."  See Third McComb Aff., ¶ 32, Ex. 7, p. 2.  Adding the religious suffixes of "-El" or "-Bey" to the legal name of inmate indicates that an inmate is a Moorish American and does not denote a profession, whereas the title of "pastor" commonly indicates a position of leadership in a religious group. Id., ¶ 33.  Therefore, Muslim inmates using the religious suffixes of "-El" or "-Bey" are not the same as plaintiff using the title of "Pastor."

employment, as inmates do not have a liberty or property interest in employment.  See Defs.' Mem., p. 46.  As for denial of his mail, defendants argued that procedural due process only requires that an inmate receive notice, an opportunity to be heard and an opportunity to appeal, which plaintiff received via two levels of review.  Id.

Defendants also contended that plaintiff cannot make out a substantive due process violation with respect to the loss of his prison job or denial of his mail, as he has presented no evidence of the denial of a fundamental right or conduct that shocks the conscience.  Id., p. 47.

Plaintiff responded that Minnesota inmates have a liberty and property interest in prison employment since they are mandated to work under Minnesota law.  See Pl.'s Mem., p. 23 (citing Minn. Stat. §§ 243.18, 243.88).  Plaintiff further argued that denial of prison employment for over two years "clearly shocks the conscience" and that defendants did not apply MNDOC policies as it relates to denying him employment in a manner that is applied to any other inmate.[26]  Id.

### 1.    Procedural Due Process

As stated previously, a procedural due process claim "is cognizable only if there is a recognized liberty or property interest at stake."  Johnson v. City of Minneapolis, 152 F.3d 859, 861 (8th Cir. 1998).  For a property interest to arise, a plaintiff must have more than "mere subjective expectancy."  Batra v. Board of Regents of the Univ. of

---

[26]    Plaintiff did not address defendants' assertion that the procedure provided by the MNDOC for the denial of mail was lawful.  Thus, defendants' motion for summary judgment as it relates to any procedural due process mail claim should be granted. Koscielski v. City of Minneapolis, 393 F. Supp.2d 811, 818 n.5 (D. Minn. 2005) ("Plaintiffs have clearly waived their remaining claims for declaratory relief (Count III) and judicial review (Count IV) because they have not responded to the City's Motion regarding these claims (citing Graham v. Rosemount, Inc., 40 F. Supp.2d 1093, 1101 (D. Minn. 1999)).

Neb., 79 F.3d 717, 720 (8th Cir. 1996) (citations omitted). "Property interests are created by existing rules or understandings that stem from an independent source, such as state law." Johnson, 152 F.3d at 861 (citing Board of Regents v. Roth, 408 U.S. 564, 577 (1972)).

The Eighth Circuit employs a two-part test to determine whether a state statute or policy is sufficient to create a constitutionally protected property interest:

> A statute, regulation, or official policy pronouncement will give rise to a protected property interest only where (1) it contains particularized substantive standards or criteria that guide the decisionmakers, and (2) it uses mandatory language requiring the decisionmakers to act in a certain way, thus limiting the official's discretion.

Jennings v. Lombardi, 70 F.3d 994, 995-996 (8th Cir. 1995) (citing Craft v. Wipf, 836 F.2d 412, 417 (8th Cir. 1987)).

Minn. Stat. § 243.18 provides that "[a]ll inmates are required to work. An inmate who fails to perform an available work assignment shall be sanctioned either by not earning good time or by serving a disciplinary confinement period, as appropriate, for any day on which the inmate does not perform the work assignment. . . ."[27] Minn. Stat. § 243.18 requires inmates to work at available work assignments; it does not require the prison facility to provide them with work. In any event, even if § 243.18 were interpreted to require an inmate to work, Minnesota law makes clear that no property (i.e. compensation) is mandated in return for such work. The Minnesota statute authorizing wages to inmates provides the Commissioner of Corrections with discretionary authority to pay (or not pay) wages to inmates:

---

[27] Minn. Stat. § 243.88 has no application as it only applies to private industry on prison grounds and employment of inmates by private employers.

> Notwithstanding any law to the contrary, the commissioner of corrections <u>may</u> provide for the payment to inmates of correctional facilities under the commissioner's management and control any pecuniary compensation the commissioner deems proper, the amount of compensation to depend upon the quality and character of the work performed as determined by the commissioner of corrections and the chief executive officer.

Minn. Stat. § 243.23, subd. 1 (emphasis added).

Where, as here, there is no liberty or property interest in employment, no procedural due process was required in conjunction with terminating plaintiff from prison employment. Defendants are entitled to summary judgment on plaintiff's claim that he was denied due process when his prison job was taken away from him.

## 2.    Substantive Due Process

"To recover for a deprivation of substantive due process, a 'plaintiff 'must demonstrate both that the official's conduct was conscience-shocking, and that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" <u>Lawrence v. City of St. Paul</u>, 740 F. Supp.2d 1026, 1037 (D. Minn. 2010) (quoting <u>Slusarchuk v. Hoff</u>, 346 F.3d 1178, 1181-82 (8th Cir. 2003), quoting <u>Moran v. Clarke</u>, 296 F.3d 638, 651 (8th Cir. 2002) (en banc)); <u>see also</u> <u>Dodd v. Jones</u>, 623 F.3d 563, 567 (8th Cir. 2010), (quoting <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n. 8 (1998) ("state officials are liable, on a theory of substantive due process, only if their actions are so egregious or outrageous as to 'shock the contemporary conscience.'"). "[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases." <u>Myers v. Scott Cnty.</u>, 868 F.2d 1017, 1018 (8th Cir. 1989).

Because there is no state right to paid prison employment, the loss of paid prison employment does not constitute a fundamental right under the constitution. See <u>Lyon v. Farrier</u>, 727 F.2d 766, 769 (8th Cir.), <u>cert. denied</u>, 469 U.S. 839 (1984). Therefore, precluding an inmate from engaging in prison employment, for which there is no applicable constitutional right, is not conduct that is so egregious or outrageous as to "shock the contemporary conscience." As such, defendants are entitled to summary judgment on this claim.

**J.    Retaliation Claims**

Plaintiff claimed defendants retaliated against him for filing grievances by authoring NOVs against him, interfering with his ability to access the court because he brought the present suit, and for transferring him to the MCF-OPH in retaliation for prosecuting the present case.

To sustain a retaliation claim, a prisoner must show that the primary purpose of the defendant's alleged retaliatory action was to punish the prisoner for attempting to exercise his constitutional rights. As explained by the Eighth Circuit, "[t]o succeed on a claim of retaliatory transfer or retaliatory discipline, an inmate must prove that, but for an unconstitutional retaliatory motive, the transfer or discipline would not have occurred." <u>Johnson v. Esry</u>, No. 98-2573, 2000 WL 375269 at *1 (8th Cir. 2000) (per curiam) (citation omitted). Thus, the prisoner must show that he would not have suffered the alleged retaliatory mistreatment at issue "but for" the defendant's retaliatory motive. See <u>Kind v. Frank</u>, 329 F.3d 979, 981 (8th Cir. 2003) (prisoner's retaliation claim was properly dismissed where he "failed to show that but for his assertions of his constitutional rights, he would not have been transferred"); <u>Sisneros v. Nix</u>, 95 F.3d 749,

752 (8th Cir. 1996) ("[i]n a retaliatory transfer case, 'the burden is on the prisoner to prove that but for an unconstitutional, retaliatory motive the transfer would have not occurred' ") (quoting Goff, 7 F.3d at 738); Hazen v. Reagen, 16 F.3d 921, 926 (8th Cir. 1994) ("for an inmate to prove that his transfer was in retaliation for the exercise of First Amendment rights, he must establish that he would not have been transferred 'but for' the retaliatory reason").

Defendants contended that while plaintiff alleged in the Third Amended Complaint that he was transferred to segregation in retaliation for exercising his First Amendment right to access the courts, plaintiff was already in disciplinary segregation and was level 5 security threat at the time of his transfer to Minnesota's most secure prison. See Defs.' Mem., p. 48. As such, plaintiff cannot establish that "but for" his attempt to exercise his right to access the courts, he would have remained at MCF-STW. Id.

In response, plaintiff stated that he has provided clear evidence (but without identifying such evidence), that defendants retaliated against him for exercising unidentified protected rights. See Pl.'s Mem., p. 23. According to plaintiff, there would not have been a significant amount of discipline imposed on him but for the retaliatory actions of defendants for violations that did not exist and that he did not commit, especially as these violations relate to the exercise of his rights of Sovereign Nationality. Id., pp. 23-24.

In reply, defendants complained that plaintiff only argued that unspecified defendants were biased or prejudiced against him, but provided no specific facts in his opposition that would prove a claim of retaliation. See Defs.' Reply, p. 20. Further,

defendants maintained that plaintiff was now attempting to frame his retaliation argument as a way of re-litigating prison disciplinary hearings where he did not prevail. Id.

Plaintiff was incarcerated at MCF-STW from December 15, 2004 until November 4, 2010, at which time he was transferred to MCF-OPH. Because of his criminal history and history of disciplinary violations, at all times relevant to this case, plaintiff has been classified as a level 5 offender, the maximum security level for an offender, indicating that he presents a very high security risk. See Third McComb Aff., ¶¶ 8, 9. While at MCF-STW, plaintiff was found guilty of at least 25 instances of disciplinary violations. Id., Ex. 3 (Discipline History Report). According to McComb, MCF-OPH's design and layout presented a greater level of security and at the time of plaintiff's transfer from MCF-STW to MCF-OPH, MCF-OPH was the only facility that was designated to house inmates who are classified as level 5. Id., ¶ 7. McComb stated that plaintiff was transferred to MCF-OPH because he was a level 5 inmate who presented a very high security risk, and because of his criminal history and history of disciplinary violations.[28] Id., ¶ 10.

Given plaintiff's classification level, the offense for which he was convicted and his extensive disciplinary record, the Court cannot find that he would not have been transferred to MCF-OHP (as the only level 5 facility within MNDOC at the time), "but for" his petitioning the courts for relief. Similarly, plaintiff has pointed this Court to no evidence that the NOVs against him would not have been brought, "but for" his grievances.

---

[28] Plaintiff was later transferred back to MCF-STW because MNDOC has many more level 5 inmates than there are beds at MCF-OPH. Third McComb Aff., ¶ 9.

As for plaintiff's suggestion that defendants retaliated against him for exercising his rights of Sovereign Nationality or accessing the court in this case, by taking disciplinary actions against his person and withholding certain legal property, plaintiff has not identified how he was denied the ability to exercise a legitimate right. The Court has already concluded that his right to access the court in this case has not been impeded by defendants. <u>See</u> Report and Recommendation, Section III.D, <u>supra</u>. Additionally, the Court has previously determined that plaintiff does not have the right to use his proclaimed Sovereign Nationality in any process that could be used to file or threaten to file baseless liens or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor. <u>See</u> Report and Recommendation, n. 21, <u>supra</u>. Moreover, plaintiff has not presented any evidence that he has attempted to assert a Sovereign Nationality argument with a court that resulted in a retaliatory action. Instead, all plaintiff has submitted is his bald opinion that "[d]efendants have punished Plaintiff & retaliated upon his belief of Sovereign Nationality & they cannot do this." <u>See</u> Pl.'s Aff., ¶ 75. Indeed, the record shows that plaintiff was punished for communication with another inmate that he was filing a UCC lien against a staff member, possession of a variety of UCC-related materials, interception of a letter from plaintiff showing that he was planning to file a UCC lien against staff member, and making threats about filing liens against staff. <u>See</u> Third McComb Aff., Exs. 33, 34; Hudson Aff., Exs. 3, 4; Affidavit of Gregory Lindell [Docket No. 175], ¶¶ 25, 27. Additionally, MNDOC has represented that inmates may possess and mail documents that profess their sovereignty and discuss sovereign rights and theories as it relates to criminal appeals, post-conviction motions, and habeas corpus

proceedings.  Third McComb Aff., ¶ 93.

For all of these reasons, this Court finds that plaintiff has not demonstrated that defendants retaliated against him in conjunction with, much less "but for," the exercising of an actual constitutional right.  Therefore, defendants' motion for summary judgment should be granted as to plaintiff's claims of retaliation.

### K.    Search and Seizure Claims

In the Third Amended Complaint, plaintiff claimed that defendants trespassed on his property and seized his legal filings and supplies, including UCC fillings and other personal effects, and failed to return these items to him in violation of the First, Fourth, Fifth, Eighth and Fourteenth Amendments.

Defendants argued that plaintiff's allegations that he was subjected to unlawful searches of his cell and belongings while he was in segregation fail because the Fourth Amendment does not preclude the searches of inmate cells since they have no reasonable expectation of privacy.  See Defs.' Mem., pp. 48-49.  Plaintiff responded that defendants trespassed on his property three to five times a week and stole his documents and property, all of them which were legal in nature, in order to threaten him and deny him access to the courts.  See Pl.'s Mem., p. 24.  In his Affidavit, plaintiff stated that unnamed defendants seized and destroyed his personal private letters to his children, friends, family, loved ones and fellow Christians; stole and destroyed his private personal property and legal materials from July 2009 through October 2012; and defendant Richard Wilson, a Sergeant at MCF-STW (Third Amended Complaint, ¶ 232) admitted to stealing his private and legal documents.  See Pl.'s Aff., ¶¶ 12, 23, 64.  Plaintiff attached an undated note regarding seizure of documents by Wilson, in which

Wilson stated as follows:

> Lt.
>
> This is what I took from Duwenhoegger's cell.  Much of it is UCC related.  Some of the items I took look weird and I took them for review.  I did not have him weigh the remaining items  in his cell but I will do that later.  He was pretty upset so I did not want to push him.  I would take a close look at this stuff and see what you think.  I will talk to you about what you want me to do with it later.
>
> Wilson

Id., Attach. 11.[29]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The Fourth Amendment prescription against unreasonable searches does not apply to actions of prison personnel within the confines of prison. See Hudson v. Palmer, 468 U.S. 517, 526 (1984) (holding that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply with the confines of the prison cell).  Likewise, the Fourth Amendment does not protect against the seizure of items in the prison context that officials believe disserve legitimate institutional interests.  Id. at 528 n. 8.

The fact that plaintiff's cell was searched frequently does not amount to a Fourth Amendment violation due to the lack of any legitimate subjective expectation by plaintiff

---

[29]    Plaintiff also attached several offender kite forms from September 2012, as proof of shakedown searches of his cell that resulted in documents being taken.  See Pl.'s Aff., Attachs. 2-5.  These alleged incidents are not encompassed by the Third Amended Complaint and cannot be considered in response to defendants' motion.

of privacy in his cell.  Further, there is no dispute that defendants could seize possible contraband for review from his cell.  <u>See</u> Third McComb Aff., ¶ 46, Ex. 18 (MDOC's Division Directive 301.010); Ex. 19 (MDOC's Division Directive 301.030), p. 2.  Plaintiff has failed to point the Court to any evidence that the items taken from his cell and ultimately never returned, including the UCC materials taken by Wilson, were not contraband pursuant to valid MNDOC policies and rules.  As such, defendants' motion for summary judgment as it relates to any unlawful search and seizure of documents and materials from his cell should be granted.[30]

## L.    Conditions of Confinement Claims

Plaintiff claimed that defendants wantonly and unnecessarily inflicted pain and suffering on him, deprived him of the "minimal civilized measure of life's necessities," and disregarded his health and safety.  Pl.'s Mem., p. 25.  In support, he asserted that defendants seized his prescription glasses, delayed in allowing him to see an optometrist to obtain new glasses, and caused his eyesight to worsen after staff assaulted him and kicked in his right eye.  <u>Id.</u>  Additionally, plaintiff claimed that defendants harassed and attacked him three to five times a week, subjected him to hourly and daily punishments, and took away his privileges for more than six months which left him only able to leave his cell three times week for a ten minute shower and

---

[30]     None of the parties addressed plaintiff's claim that the seizure of contraband from plaintiff's cell violated the First, Fifth, Eighth and Fourteenth Amendments.  Even if such argument were not deemed waived for failure to present argument to the Court, (<u>see</u> <u>Koscielski</u>, 393 F. Supp.2d at 818 n.5), such claims have no merit.    The First Amendment addresses freedom of speech and religion; the Fifth Amendment addresses due process as it relates to the federal government; the Eighth Amendment precludes cruel and unusual punishment; and the Fourteenth Amendment applies the first eight Amendments to the states and contains the equal protection clause.

with no ability to correspond with anyone.  Id.  According to plaintiff, all of this conduct proved that defendants acted with deliberate indifference to harm him.  Id.; see also Pl.'s Aff., ¶ 88 (asserting that McComb refused to provide plaintiff with the evidence to validate defendants' cruel and unusual punishment of him).

Defendants, on the other hand, believing that plaintiff's Eighth Amendment claim was premised on searches of his cell and belongings, denial of shower shoes, and removal of his eyeglasses for a period of time, asserted that even if plaintiff's claims were true, no Eighth Amendment claim can survive.  See Defs.' Mem., p. 50 (citing Third Amended Complaint, pp. 16, 35-38, 59, 74).  This is because the alleged conduct does not amount to the type of serious conditions required to assert an Eighth Amendment violation, noncompliance with a valid prison rule does not automatically convert the consequences flowing from such violations into unconstitutional punishments, and plaintiff cannot show that any defendant acted with deliberate indifference.  See Defs.' Mem., p. 50.

The Eighth Amendment to the United States Constitution prohibits the government from inflicting "cruel and unusual punishments" on those convicted of crimes.  See Rhodes v. Chapman, 452 U.S. 337, 344-46 (1981).  The prohibition against "cruel and unusual punishments" is violated by the "unnecessary and wanton infliction of pain contrary to contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 32 (1993) (citation omitted).  To prevail on a cruel and unusual punishment claim under the Eighth Amendment, two requirements must be met. "First, the deprivation alleged must be, objectively, sufficiently serious,"—meaning that "the prison official's acts or omissions must result in the denial of 'the minimal civilized measure of

life's necessities." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994) (marks and citations omitted). Second, it must be shown that the prison official, acted with "deliberate indifference to inmate health or safety"—meaning that "a prison official must have a 'sufficiently culpable state of mind." <u>Id.</u> (marks and citations omitted). "Accordingly, it is well-settled that a prisoner's confinement must not result in a serious deprivation of his basic human needs, or of a minimal, civilized measure of life's necessities. As stated, the focus is on 'basic human needs--e.g., food, clothing, shelter, medical care and reasonable safety.'" <u>King v. Dingle</u>, 702 F. Supp.2d 1049, 1072 (D. Minn. 2010) (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 32 (1993)) (citations omitted).

Plaintiff has provided no evidence that he was not allowed to leave his cell for a period of six months, save to take shower three times a week, or that he was prohibited from writing to outsiders. Further, the fact that plaintiff was placed in segregation for a lengthy period of time and lost privileges for a period of 6 months does not amount to such a serious deprivation so as to warrant plaintiff relief under the Eighth Amendment. <u>See</u> <u>Rahman</u>, 300 F.3d at 973-74 (finding that 26 months in segregation and the deprivation of other privileges was not "sufficiently serious" to establish an Eighth Amendment violation); <u>cf.</u>, <u>Overton</u>, 539 U.S. at 137 (a claim of "cruel and unusual punishment" under the Eighth Amendment requires a showing of "dramatic departure form accepted standards for conditions of confinement" and the creation of "inhumane prison conditions. . . .").

Additionally, there is no evidence that plaintiff was precluded from having use of his glasses for an unreasonable period of time or that he was denied proper medical care for his eyes in such a manner that it amounted to a dramatic departure from

accepted standards for conditions of confinement. To the contrary, the available record shows that he did receive treatment related to his eyes on at least two occasions. <u>See</u> Third McCombs Aff., Ex. 38. While treatment may not have been received as soon as plaintiff wanted, it was nonetheless provided and there is no evidence of any adverse effect as the result of any delay in treatment. Moreover, the record only shows that an eyeglasses case with a hidden compartment and a quarter sized lens or mirror inside had been confiscated, as opposed to plaintiff's actual glasses. <u>Id.</u>, ¶ 49, Ex. 20 (January 2010 Incident Report and NOV 418801 findings report).

Plaintiff's assertion of an assault by staff also finds no support in the record. Indeed, plaintiff pointed the Court to no evidence to support such an assertion. What is in the record is as follows: Plaintiff alleges that on September 24, 2010, two unnamed correctional officers came into his room and placed him in handcuffs and a belly chain and then shoved him to the floor, kicked him in the head, resulting in unconsciousness and then the officers removed the chains and left. <u>See</u> Third Amended Complaint, ¶¶ 399-403. The assault allegedly resulted in lacerations on his nose and cheek and blurred vision after the incident. <u>Id.</u>, ¶¶ 405-07. Plaintiff took issue with the incident reports issued by staff following this event stating that plaintiff had told staff responding to his call that he stood up, got dizzy and fell down, which resulted in his injuries. <u>See</u> McComb Third Aff., Exs. 37, 39. Plaintiff claimed that the injuries were the result of an assault. <u>Id.</u>, Ex. 39.

The Court has reviewed the video recording of the scene of the incident during which plaintiff stated on the recording that he had stood up and became dizzy and that then found himself on the floor with injuries. <u>Id.</u>, Ex. 36. There was no mention of any

assault by plaintiff. Based on the undisputed evidence in the record, the Court finds that plaintiff's claim that he was assaulted does not support a claim that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

For all of the reasons stated above, the Court finds that defendants' motion for summary judgment was it relates to plaintiff's Eighth Amendment claims should be granted.

### M. Other Potential Claims

At the close of the supporting memorandum, defendants argued that the Third Amended Complaint contains numerous other legal conclusions that do not tie directly to a constitutional claim under § 1983 and that such conclusory pleading fails to comply with the pleadings standards articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009). See Defs.' Mem., p. 52. Further, to the extent that plaintiff was attempting to plead state law claims, defendants submitted that the Court should decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Id. Finally, given the length and confusing nature of the Third Amended Complaint, and the fact that plaintiff would not provide helpful responses to their discovery calculated to learn the substance and basis of his claims, defendants asked for the right to submit additional briefing to the extent they missed any claims in the Third Amended Complaint. Id., p. 53.

In response, plaintiff claimed that the "potential claims do state a specific cause & prove the defendants deliberate & intentional conduct to cause the Plaintiff to suffer harm. . . ." Pl.'s Mem., p. 26. Plaintiff also asserted that unspecified evidence in the record proves that defendants acted with harmful intent toward plaintiff and are

continuing to do so as of this date.  Id.  In addition, plaintiff argued that defendants have had plenty of time to brief the issues in this case and could have met with him to resolve any issues.  Id., pp. 26-27.  Plaintiff also noted that defendants have not complied with this Court's order allowing him retain discovery by threatening him and ordering him to dispose of all evidence and discovery in his possession bearing on this case.  Id., p. 26. Plaintiff then reiterated his claim that he was wrongfully placed in punitive segregation for two years without a review of relevant evidence related to filing a fraudulent UCC lien on Garbison, and that this was the main issue in his case.  Id., p. 27.

As stated previously, The Third Amended Complaint is 123 pages long.  To the extent that plaintiff does not believe that defendants' motion for summary judgment covered all of the claims in this pleading, it was incumbent upon him to identify those claims for defendants and the Court.  The Court will not scour through this pleading to divine claims for plaintiff and prosecute his case for him.

Furthermore, to the extent that plaintiff now asserts that defendants forced him to destroy relevant evidence with regard to his opposition, even if true, this was an issue that should have been raised at time the threats were being made or soon after the documents were taken from him.  If defendants were violating this Court's Order [Docket No. 122] by requiring him dispose of their production of documents, as opposed to allowing him to keep the documents in his cell,[31] then he should have brought this

---

[31]    On February 13, 2012, this Court issued an Order [Docket No. 122] bearing on plaintiff's motion to compel.  At the end of the Order, the Court stated:

> Finally, this Court feels compelled to address defendants' production of documents (in excess of 1000 pages according the representations of defendants in their responsive memorandum), which may likely exceed the quantity of legal

conduct to the Court's attention as part of a motion for relief as soon as possible, as opposed to making a conclusory assertion to this effect in his opposition memorandum.

## IV. CONCLUSION

For all the reasons stated above, the Court finds that defendants' motion for summary judgment should be granted in its entirety. Moreover, the Court concludes that allowing plaintiff to amend the Third Amended Complaint to assert the claims against defendants in their individual capacities would be futile since the Court has concluded that summary judgment should be granted based on the merits of plaintiff's claims. As such, the Court recommends that the Third Amended Complaint be dismissed with prejudice.

## V. RECOMMENDATION

For the reasons set forth above, it is recommended that:

1.     Defendants' Motion for Summary Judgment [Docket No. 170] be **GRANTED**.

---

materials plaintiff is permitted to have in his cell at any one time. In order to insure that plaintiff has the opportunity to examine and work with the production in its entirety throughout this litigation, defendants shall allow plaintiff to retain in his cell the <u>entire production</u> of documents by defendants if he selects it for retention in his cell, even if it exceeds the amount of legal materials he may ordinarily keep in his cell at one time (<u>e.g.</u> the five pounds permitted for an inmate who is in segregation). However, if plaintiff selects only a portion of the document production for retention in his cell, or returns the production to his legal bin, then the general restrictions on the amount of legal materials plaintiff may keep in his cell shall apply. If plaintiff abuses this privilege, defendants may approach the Court for immediate relief.

<u>Id.</u>, p. 10.

2.      Plaintiff's Third Amended Complaint should be dismissed with prejudice.


Dated:      January 28, 2013


                                        *s/ Janie S. Mayeron*
                                        JANIE S. MAYERON
                                        United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 11, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within fourteen days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.